Maria ESPOSITO, as Executrix of the
Estate of Marion T. Thomson

v.

James P. O'HAIR et al.

No. 2004–186–Appeal.

Supreme Court of Rhode Island.

Dec. 19, 2005.

Christopher P. Sheehan, Jacqueline G. Kelley, Providence, for Plaintiff.

Thomas R. Bender, Michael G. Sarli, Providence, for Defendants.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

In this medical malpractice dispute, we must determine whether Medicaid is a "state income disability" act, and thus falls within a list of collateral source payments that are admissible to reduce a plaintiff's damages under G.L.1956 § 9–19–34.1.

## I

### Background

In March 2001, Marion Thomson filed suit against Atmed Treatment Center, Inc., Hani Zaki, M.D., Inc., and three physicians—James P. O'Hair, Daniel Regan, and Hani Zaki—alleging that the defendants were negligent in failing to diagnose her with Hodgkins Lymphoma. Thomson died from this disease on March 15, 2003. When the complaint was amended to substitute Maria Esposito, executrix of Thomson's estate, as plaintiff, Dr. Zaki's insurer, the Medical Malpractice Joint Underwriting Association of Rhode Island (MMJUA), was added as a defendant.[1]

In September 2003, the parties reached a somewhat unusual settlement agreement in which $440,000 was paid to Thomson's estate, and an additional sum of $381,689.26, which was the amount of the decedent's medical expenses, was set aside. The defendants filed a motion for judgment as a matter of law as to this amount, arguing that plaintiff was not entitled to recover these expenses because they were paid by Rhode Island's Medicaid program, and under § 9–19–34.1,[2] recovery should be reduced by collateral source payments made pursuant to a state income disability act. Esposito filed a cross motion, arguing that Medicaid benefits are not a state income disability act, and therefore defendants were liable to her for the decedent's medical expenses.[3] Esposito further claimed that, even if the language of § 9–19–34.1 were to permit defendants to offset their liability with evidence of the decedent's Medicaid benefits, the statute would be preempted by federal law, and further would be unconstitutional because it violates principles of due process and equal protection.

The parties' motions came before the

---

1. General Laws 1956 § 27–7–2 does not permit a plaintiff to bring a direct action against an insurer while the insured defendant is alive; however, Dr. Zaki passed away after the initial complaint was filed.

2. As discussed *infra*, G.L.1956 § 9–19–34.1 allows defendants in medical malpractice cases to offset their liability with evidence that a plaintiff's medical expenses have been paid by a third party.

3. Because the parties stipulated to the amount of damages and there were no issues of fact in dispute, the motion justice applied a summary judgment standard to the parties' motions.

Superior Court on December 1, 2003,[4] and in April 2004 the court entered judgment in favor of Esposito. The court reasoned that § 9–19–34.1 must be strictly construed because it abrogates the common law collateral source rule by allowing defendants to reduce their liability by presenting evidence that the plaintiff's medical expenses were paid by third parties. Strictly construing § 9–19–34.1, the court held that Medicaid was not a state income disability act within the meaning of the statute because it does not compensate individuals for lost income, and recipients need not be disabled to receive benefits. Because the court agreed with plaintiff that § 9–19–34.1 did not include Medicaid benefits as a collateral source payment that was admissible to offset damages, it declined to address the constitutional arguments she had raised.

The defendants timely appealed. As grounds for appeal, defendants contend that § 9–19–34.1 is a remedial statute that should have been construed liberally to include Medicaid payments. Such a construction, defendants say, is consistent with the Legislature's goal of controlling the cost of medical malpractice insurance premiums. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## II

### Standard of Review

■■■ This Court applies *de novo* review to questions of statutory interpretation. *Webster v. Perrotta*, 774 A.2d 68, 75 (R.I.2001). When a statute fails to define a term, "the words of a statute will be given their usual meaning." *Carlson v.*

*McLyman*, 77 R.I. 177, 180, 74 A.2d 853, 855 (1950). In construing a statute "this Court will not broaden statutory provisions by judicial interpretation unless such interpretation is necessary and appropriate in carrying out the clear intent or defining the terms of the statute." *Simeone v. Charron*, 762 A.2d 442, 448–49 (R.I.2000).

## III

### Analysis

### A. The Common Law Collateral Source Rule

■■■ "The collateral source rule is a well-established principle of Rhode Island law." *Moniz v. Providence Chain Co.*, 618 A.2d 1270, 1271 (R.I.1993). Absent a statutory provision to the contrary, this common law rule prevents defendants in tort actions from reducing their liability with evidence of payments made to injured parties by independent sources. *Votolato v. Merandi*, 747 A.2d 455, 463 (R.I.2000). Although this rule may allow plaintiffs to recover damages in excess of their injuries, the rationale underlying the rule is that it is better for the windfall to go to the injured party rather than to the wrongdoer. *Colvin v. Goldenberg*, 108 R.I. 198, 202, 273 A.2d 663, 666 (1971); *Oddo v. Cardi*, 100 R.I. 578, 584–85, 218 A.2d 373, 377 (1966).

### B. Medical Malpractice Reforms

In 1976, the General Assembly enacted the Medical Malpractice Reform Act in response to growing concerns over the limited availability and rising cost of medical malpractice insurance. *See* P.L. 1976, ch. 244; *see also Boucher v. Sayeed*, 459 A.2d

---

**4.** On October 2, 2003, the Rhode Island Department of Human Services (DHS), which oversees the state's Medicaid program, was allowed to intervene as a party and filed a motion arguing that it was entitled to reimbursement of funds expended on behalf of the decedent. *See* G.L.1956 § 40–6–9 (Medicaid recipient is deemed to have assigned DHS "any and all rights and interests" in recovery of medical expenses).

87, 88–89 (R.I.1983) (outlining legislative history of medical malpractice reforms). Part of this act included the creation of a collateral source statute, codified as § 9–19–34. Prior to this legislation, defendants could not reduce their liability by introducing evidence of payments made to injured parties by independent sources. *See Colvin*, 108 R.I. at 202, 273 A.2d at 666. Section 9–19–34 made collateral benefits received by a plaintiff admissible in medical malpractice actions against physicians, effectively abrogating the common law collateral source rule in such actions.

As originally enacted, § 9–19–34 allowed defendants to introduce payments from "the United States social security act, any state or federal income disability or workers' compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services."

During that same 1976 legislative session, the General Assembly also enacted G.L.1956 § 42–14.1–1, which authorized the creation of the MMJUA. *See* P.L. 1976, ch. 1, § 1. The General Assembly explained that this enactment was based "[u]pon a finding by the director of business regulation that there exists a lack of competitive, stable market for medical malpractice insurance in the state of Rhode Island and that as a consequence thereof, there is peril to the public health safety and welfare of the people of the state * * *." *Id.* To address these concerns, the MMJUA was formed to stabilize the cost of medical malpractice insurance by pooling expenses and losses in insurance coverage. *See St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531,

537 n. 6, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) (discussing the rationale for creation of Rhode Island's MMJUA).

By 1986, concerns over the cost of medical malpractice insurance had not subsided. The Legislature took further action with its passage of P.L. 1986, ch. 350, "An Act Relating to Malpractice." The preamble to the act states as follows:

"WHEREAS, The number of medical and dental malpractice claims being made and the cost of settling such claims by the Medical Malpractice Joint Underwriting Association of Rhode Island, an agency of state government designed to provide a continuing stable institution for medical and dental malpractice liability insurance and the dominant such insurance carrier in this state, has continued to increase significantly; and

"WHEREAS, As a result, the Medical Malpractice Joint Underwriting Association has recently experienced an accelerated negative financial position resulting in a fund deficit as of December 31, 1985; and

"WHEREAS, Insolvency of said Association would have an adverse financial effect upon the citizens of Rhode Island who purchase liability insurance of any type as their premiums would increase in order to offset the deficit or, alternatively, such insolvency would adversely affect all the taxpayers of Rhode Island; and

* * *

"WHEREAS, The General Assembly finds that a significant number of medical and dental malpractice claims have been filed against a relatively few health care providers; and

* * *

"WHEREAS, the General Assembly acting within the scope of its police power finds the statutory remedy herein

provided is intended to be an adequate and reasonable remedy now and into the foreseeable future." P.L. 1986, ch. 350.

Like the 1976 act, the 1986 act also included a collateral source statute, § 9–19–34.1, that was markedly similar to its predecessor, but that applied only to medical malpractice actions occurring after January 1, 1987. *See* P.L. 1986, ch. 350, § 7. This updated version of the collateral source statute, § 9–19–34.1, provides:

"In the event the defendant so elects, in a legal action based upon a cause of action arising after January 1, 1987, for personal injury against a licensed physician, hospital, clinic, health maintenance organization, professional service corporation providing health care services under chapter 5.1 of title 7, dentist, or dental hygienist based upon professional negligence, the defendant may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to any state income disability or workers' compensation act, any health, sickness or income disability insurance, accident insurance that provides health benefits or income disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services. Where the defendant elects to introduce such evidence, the plaintiff may introduce evidence of any amount which the plaintiff has paid or contributed to secure his or her right to any insurance benefits concerning which the defendant has introduced evidence. When such evidence is introduced, the jury shall be instructed to reduce the

award for damages by a sum equal to the difference between the total benefits received and the total amount paid to secure the benefits by the plaintiff or the court may ascertain the sum by special interrogatory and reduce the award for damages after verdict. Whenever an award is so reduced, the lien of any first party payor who has paid such a benefit against the judgment shall be foreclosed and the plaintiff shall have no legal obligation to reimburse the payor."

Section 9–19–34.1 differed from the earlier version of the collateral source statute in three material ways. First, the updated statute extended its coverage to include the professional malpractice of dentists and dental hygienists. Second, the General Assembly removed reference to payments made pursuant to the "United States social security act" and "federal" income disability or workers' compensation acts. Finally, the General Assembly added a clause stating, "[w]henever an award is [reduced by collateral source payments], the lien of any first party payor who had paid such a benefit against the judgment shall be foreclosed and the plaintiff shall have no legal obligation to reimburse said payor." *Id.*[5] Apart from these changes, the revised version of the collateral source statute was essentially the same as its predecessor.

## C. Rhode Island's Medicaid Program

At issue before this Court is whether § 9–19–34.1's reference to "any state income disability" act is intended to include Medicaid benefits as one of the collateral source payments that defendants may introduce into evidence to offset their liability to plaintiff. Rhode Island's medical as-

5. The most recent amendment to the collateral source statute occurred during the 1997 legislative session. At that time, the General Assembly repealed the original statute, § 9–

19–34, with P.L. 1997, ch. 326, § 101. There have been no amendments to the collateral source statute since 1997.

sistance program, commonly known as Medicaid, is designed to assist low income persons with the cost of medical care. G.L.1956 § 40–8–1.[6] To be eligible for Medicaid assistance, a person must have "insufficient income and resources" and fall within one of five categories of recipients. Section 40–8–3. In relevant part, § 40–8–3 provides as follows:

"Eligibility requirements.—Medical care benefits shall be provided under this chapter to at least any person (1) who has attained the age of sixty-five (65) years, or (2) who has no vision or whose vision is so defective as to prevent performance of ordinary activities for which eyesight is essential, or (3) who is at least eighteen (18) years of age and who is permanently and totally disabled, or (4) who is under the age of eighteen (18) years, and who has been deprived of parental support or care by reason of the death, continued absence from the home, unemployment or physical or mental incapacity of a parent (called hereafter 'dependent child') and who is living with a relative in a place of residence maintained by one or more of such relatives as his or her or their own home, or is in foster boarding care, or (5) the relative as defined in subsection (8) of § 40–8–2, with whom any such dependent child is living * * *."

### D. Is Medicaid a State Income Disability Act?

The defendants urge us to hold that Medicaid is a state income disability act within the meaning of § 9–19–34.1. Although § 9–19–34.1 does not explicitly refer to Medicaid, defendants maintain that we should consider the statute to be remedial in nature and therefore should construe it liberally because doing so is consistent with the Legislature's goal of controlling the cost of medical malpractice insurance premiums. As a result, argue defendants, Esposito's $381,689.26 claim for medical expenses should be reduced by the amount of medical bills that Medicaid paid on the decedent's behalf.

Conversely, Esposito asserts that because § 9–19–34.1 abrogates the common law collateral source rule, we should construe it strictly and conclude that Medicaid benefits are not covered by the statute. To support this position, Esposito presses this Court to adopt the rationale of a California case interpreting a similar statute, which held that Medicaid payments are not admissible as collateral source payments. *See Brown v. Stewart,* 129 Cal.App.3d 331, 341–42, 181 Cal.Rptr. 112 (1982).[7] She further notes that other jurisdictions have strictly construed collateral source statutes that limit a plaintiff's recovery. *See, e.g.,*

---

**6.** Medicaid is a cooperative federal and state welfare program. *In re Grand Jury Investigation,* 441 A.2d 525, 529 (R.I.1982). To receive federal funds, states must comply with the federal requirements, as set forth in title XIX of the federal Social Security Act, 42 U.S.C. § 1396 *et seq.* One such requirement is that the state establish income and resource requirements for its Medicaid recipients. *See* G.L.1956 § 40–8–3(v) (requiring DHS to establish eligibility requirements in accordance with federal law). These requirements are consistent with the state's declared policy of providing medical assistance to those persons "who possess the characteristics of persons

receiving public assistance." Section 40–8–1(c).

**7.** The collateral source statute at issue in *Brown,* like Rhode Island's collateral source statute as it existed before 1986, applied to payments made "as a benefit to the plaintiff as a result of the personal injury pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act * * *." Cal. Civ.Code § 3333.1(a) (West 2005). With the exception of its references to the Social Security Act and the federal acts, the California statute is substantially similar to § 9–19–34.1.

*Jones v. Kramer,* 267 Conn. 336, 838 A.2d 170, 177–78 (2004); *Allstate Insurance Co. v. Rudnick,* 761 So.2d 289, 293 (Fla.2000); *Oden v. Chemung County Industrial Development Agency,* 87 N.Y.2d 81, 637 N.Y.S.2d 670, 661 N.E.2d 142, 144 (1995). Esposito contends that these cases are consistent with this Court's well-established rule that statutes that abrogate the common law must be strictly construed. *See, e.g., Gem Plumbing & Heating Co. v. Rossi,* 867 A.2d 796, 803 (R.I.2005); *Simeone,* 762 A.2d at 445.

 Despite this backdrop of cases holding that statutes in derogation of the common law should be strictly construed, defendants argue that the Legislature's use of the term "remedy" in the preamble to P.L. 1986, ch. 350, coupled with the statute's goal of controlling the cost of insurance premiums, makes clear that § 9–19–34.1 is a remedial statute. Thus, defendants urge, a liberal construction is necessary to effectuate the Legislature's intent.[8] It is our view, however, that a statute is not "remedial" simply because its goal is to improve societal woes. *See Ayers–Schaffner v. Solomon,* 461 A.2d 396, 399 (R.I.1983). If this were the case, all statutes would be remedial to some degree. In the parlance of statutory construction, a remedial statute is "one which affords a remedy, or improves or facilitates remedies already existing for the enforcement or rights of redress of wrongs * * *." *Id.* Section 9–19–34.1 does not fit this definition, however, because it narrows the common law collateral source rule by limiting a plaintiff's recovery.

Notwithstanding § 9–19–34.1's abrogation of the common law collateral source rule, defendants note that this Court previously has applied liberal construction to a statute in derogation of the common law. In *Dias v. Cinquegrana,* 727 A.2d 198, 200 (R.I.1999), we interpreted the word "accident" to include intentional acts because doing so was necessary to effectuate the Legislature's intent. The statute at issue in *Dias* abrogated the common law by extending potential liability for automobile accidents to a vehicle's owner, even in the absence of a common law agency relationship with the driver. In construing the statute, we explained that it was imperative to "determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes." *Id.* at 199–200.

 Relying on *Dias,* defendants urge that even though § 9–19–34.1 abrogates the common law collateral source rule, we should construe it liberally because doing so is necessary to effectuate legislative intent. We disagree for several reasons. First, *Dias* is inapposite to the present case because the statute at issue in that case afforded a remedy to a plaintiff, whereas § 9–19–34.1 potentially limits a plaintiff's recovery. Second, we see no evidence that the Legislature intended to control the cost of medical malpractice insurance premiums by diverting public Medicaid funds to tortfeasors or their insurers. Finally, and most importantly, whether we apply a strict or liberal reading to § 9–19–34.1, we are not persuaded that the Legislature intended the term "income disability act" to describe this state's Medicaid program.

Although it is true that some Medicaid recipients are disabled, we cannot construe Medicaid as an income disability act, because many Medicaid recipients are not

---

**8.** The defendants correctly note that this Court previously has held that remedial statutes should be liberally construed to effectu-ate legislative intent. *See, e.g., State v. Carter,* 827 A.2d 636, 643 (R.I.2003).

disabled, such as those who are aged sixty-five or older. *See* § 40–8–3 (listing eligibility requirements for Medicaid). Others who are disabled may not qualify for benefits if their incomes or resources exceed a certain amount. *Id.* Therefore, disability is not the lynchpin to the receipt of Medicaid; having a disability does not guarantee that a person will receive Medicaid, nor is being disabled a necessary condition to receive Medicaid benefits. *See id.* Moreover, when a person is eligible to receive Medicaid benefits, the DHS does not provide income to the recipients, but instead makes payments directly to the medical care providers. Section 40–8–4(a) ("The [DHS] shall furnish medical care benefits to eligible beneficiaries through a direct vendor payment plan."). Therefore, even though some Medicaid recipients may be disabled, these individuals do not receive income under the program.

The defendants acknowledge that Medicaid does not provide income to its recipients and that not all recipients are disabled. They contend, however, that Medicaid is an income disability act within the meaning of § 9–19–34.1 because a person must be "income disabled" to qualify for benefits. In other words, defendants suggest that a lack of financial resources constitutes a form of disability within the meaning of the statute. This Court has held, however, that when a statute fails to define a term, as is the case with § 9–19–34.1, the "words of a statute will be given their usual meaning." *Carlson,* 77 R.I. at 180, 74 A.2d at 855. Applying this principle to the present case, we cannot accept the proposition that the Legislature intended the word "income" as an adjective to modify the word "disability." Whether we construe the collateral source statute liberally or strictly, we ultimately reach the same conclusion. *See id.* ("Even though a statute is held remedial, * * * the court cannot arbitrarily extend the ordinary meaning of its language"). We see no evidence the Legislature intended § 9–19–34.1 to relieve private tortfeasors and their insurers from liability at the taxpayers' expense, and therefore we conclude that the Legislature intended the term "income disability act" to mean an *act* that provides *income* to persons who are *disabled.* As noted above, Medicaid does not fit this definition.

Our holding that Medicaid is not an admissible collateral source payment under § 9–19–34.1 renders it unnecessary for us to address whether the statute is preempted by federal law or is otherwise unconstitutional.

## IV

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.