#24043, #24044-aff in pt, rev in pt & rem-JKK

**2007 SD 87**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ADELINE PAPKE,                                    Plaintiff and Appellant,

    v.

THOMAS HARBERT, M.D., MARK
HARLOW, M.D. and ABERDEEN
ORTHOPEDICS & SPORTS
MEDICINE,                                         Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE SCOTT P. MYREN
Judge

\* \* \* \*

RONALD A. PARSONS, JR.
SCOTT N. HEIDEPRIEM
BRENDAN V. JOHNSON of
Johnson, Heidepriem, Miner,
 Marlow and Janklow, LLP
Sioux Falls, South Dakota

CHET GROSECLOSE                          Attorneys for plaintiff
Sioux Falls, South Dakota                    and appellant.

REED RASMUSSEN of
Siegel, Barnett and Schutz, LLP          Attorneys for defendants
Aberdeen, South Dakota                      and appellees.

\* \* \* \*

ARGUED ON MARCH 19, 2007

OPINION FILED **08/15/07**

KONENKAMP, Justice

[¶1.]    In this medical malpractice appeal, plaintiff contends that the circuit court erred in giving the jury an "error in judgment" instruction and in other respects. We affirm in part, reverse in part, and remand for a new trial.

## Background

[¶2.]    On September 3, 2002, Adeline Papke, age seventy, was outside watering her flowers when her left knee gave out and she fell. She was unable to get up on her own and was taken to the emergency room at Avera St. Luke's Hospital in Aberdeen, South Dakota. At the hospital, Papke reported a history of degenerative joint disease in both knees. The emergency room physician admitted her and contacted Dr. Thomas Harbert, an orthopedic surgeon, for further evaluation.

[¶3.]    Dr. Harbert examined Papke and recommended simultaneous bilateral total knee replacement. On October 7, 2002, Dr. Harbert and his partner, Dr. Mark Harlow, performed the dual knee surgeries. Dr. Harbert operated on Papke's right knee, while Dr. Harlow operated on her left. Three days after her surgery, her right knee dislocated. Dr. Harbert reset the knee. She was still complaining of pain, however, and, on October 16, 2002, she was admitted for inpatient physical therapy. On October 17, 2002, her right knee again dislocated. This time, after resetting her knee, Dr. Harbert applied a cast to her right leg, which extended from her thigh down to her toes. He also scheduled revision surgery for her right knee for November 8, 2002.

[¶4.]　　　　On October 25, 2002, Papke was discharged from Avera and was admitted to a nursing home to await her surgery. She was readmitted to Avera on November 8, 2002, at which time it was discovered that her left knee was dislocated. The surgery was postponed, and her left knee was placed in proper alignment. Her left leg was also placed in a cast from her thigh down to her toes. She returned to the nursing home on November 9, 2002. On November 22, 2002, she went back to Avera for revision surgery on both knees. Dr. Harbert and Dr. Harlow performed the surgeries. Thereafter, she remained in the hospital.

[¶5.]　　　　On December 2, 2002, Papke returned to the nursing home. The same day, the nursing home staff documented the presence of multiple "stage 4 pressure ulcers" on her right and left heels. On December 3, the nursing home took pictures of the sores and contacted Dr. Warren Redmond, a dermatologist, who attempted to treat her. Dr. Russell Pietz, Papke's primary care physician, also treated her while she was in the nursing home. Her knee surgeon, Dr. Harbert, saw her again on December 16, 2002. During that visit, he noted his concern regarding her skin ulcerations. He also noted the presence of "black eschar" in the same area as the ulcerations. As a result of the "increased ulceration of her feet and continued problems" Dr. Harbert brought in Dr. Bryce Iwerks, a surgeon with experience in "vascular studies and examination of the lower extremity[.]"

[¶6.]　　　　On December 18, 2002, Dr. Iwerks diagnosed Papke with "[o]bvious peripheral vascular disease." His plan, according to his treatment notes, was to "further evaluate with ultrasound and MRA and [provide] [f]urther recommendations pending results." Dr. Harbert met with Papke on December 30.

In his treatment notes, he indicated that based on his consultation with Dr. Iwerks, he would discuss with Papke her "treatment options[,] that being vascular bypass surgery vs. amputation of the left lower extremity."

[¶7.]     On January 14, 2003, Papke was admitted to the Heart Hospital of South Dakota in Sioux Falls for treatment of her ulcerations. According to her admitting physician, Dr. Felipe Navarro, because of the severity of her condition, he feared that she would lose her left leg. He proposed to assess her situation and provide her with some pain medications to keep her comfortable. She was treated at the Heart Hospital until January 18, 2003, when she was discharged to Avera McKennan in Sioux Falls. Her ulcerations were not healing, and, on February 8, 2003, Dr. Robert Suga amputated her left leg above the knee. Thereafter, she continued to receive treatment on her right leg. However, on April 17, 2003, her right leg was also amputated above the knee. After recovering from her surgery, she returned to the nursing home.

[¶8.]     On January 31, 2005, Papke brought suit against Dr. Harbert, Dr. Harlow, and Aberdeen Orthopedics & Sports Medicine (defendants), alleging medical malpractice. She averred that her medical treatment fell below the standard of care, resulting in her "gangrenous condition and double amputation." According to Papke, "defendants violated the standard of care when performing the initial surgery by failing to perform a vascular examination and leaving the tissues in the knee weak and globally unstable." Secondly, she asserted that "defendants misdiagnosed [her] vascular insufficiency following her first surgery and failed to consult a vascular specialist in order to address the worsening problem." She

alleged that if defendants had referred her "to a vascular specialist when they removed the casts on her legs immediately prior to the second surgery and discovered the large black sores" her legs might still have been saved.

[¶9.]        A jury trial was held in January 2006.  At the settling of instructions, Papke objected to the court's instruction that stated, "A physician is not necessarily negligent because the physician *errs in judgment* or because efforts prove unsuccessful.  The physician is negligent if the *error in judgment* or lack of success is due to a failure to perform any of the duties defined in these instructions." (Emphasis added).  According to Papke, the instruction erroneously and unnecessarily supplanted the applicable standard of care.  Defendants responded that the instruction was proper based on established case law.  This instruction, they argued, would give them "the right to present to the jury [their] theory of the case."  They explained that the concept of mistake in judgment was "heard from most of the witnesses who have testified," and what happened here "was a judgment call, and this jury instruction is vital to our theory of the case."  The court overruled Papke's objection, concluding that the instruction accurately reflected the state of the law in South Dakota.

[¶10.]        During closing arguments, defendants drew the jury's attention to the error in judgment instruction, stating,

> So things were going along as Dr. Harbert thought they would.
> Unfortunately, as we know he was wrong. . . .  But that did not, .
> . . make him negligent and mean that he breached the standard
> of care.  The instructions clearly say that an error in judgment
> does not necessarily amount to negligence.  And doctors have to
> make a lot of tough calls.  They make judgment calls, and that's
> what happened here.  And in retrospect, yeah, it was wrong; but
> it's not negligent.

[¶11.]    At the close of the case, the jury returned a verdict for defendants. Papke moved for a new trial on three grounds. First, she asserted that jury instruction 16, "absolving the defendants of negligence for an 'error of judgment' was misleading, confusing, and prejudicial."[1] Second, she alleged that "she was unfairly prejudiced by the admission of previously undisclosed expert testimony." Third, she "contended that even if the expert testimony in question had been properly disclosed she was further unfairly prejudiced by its admission because it was unreliable and lacked scientific foundation." After a hearing, the circuit court denied Papke's motion.

[¶12.]    Papke appeals asserting that the trial court erred when it (1) gave jury instruction 16; (2) admitted previously undisclosed expert testimony on the issue of causation; and (3) admitted scientifically unreliable expert testimony on the issue of causation. Defendants filed a notice of review alleging that the court erred when it (1) allowed Papke to enter into evidence the amount charged for her medical expenses rather than the amount actually paid by Medicare and Medicaid; and (2) denied defendants' motion to compel production of a report reviewed by Papke's expert. We affirm in part, reverse in part, and remand.

---

1.    The appellant's briefs incorrectly refer to jury instruction 19, but the correct instruction number is 16.

## Standard of Review

[¶13.]     We recently clarified our standard of review on jury instructions in

*Vetter v. Cam Wal Elec. Coop., Inc.*, 2006 SD 21, ¶10, 711 NW2d 612, 615.

> A trial court has discretion in the wording and arrangement of
> its jury instructions, and therefore we generally review a trial
> court's decision to grant or deny a particular instruction under
> the abuse of discretion standard. *See* Luke v. Deal, 2005 SD 6,
> ¶11, 692 NW2d 165, 168; Parker v. Casa Del Rey-Rapid City,
> Inc., 2002 SD 29, ¶5, 641 NW2d 112, 115. However, no court
> has discretion to give incorrect, misleading, conflicting, or
> confusing instructions:  to do so constitutes reversible error if it
> is shown not only that the instructions were erroneous, but also
> that they were prejudicial. First Premier Bank v. Kolcraft
> Enter., Inc., 2004 SD 92, ¶40, 686 NW2d 430, 448 (citations
> omitted). Erroneous instructions are prejudicial under SDCL
> 15-6-61 when in all probability they produced some effect upon
> the verdict and were harmful to the substantial rights of a party.
> Accordingly, when the question is whether a jury was properly
> instructed overall, that issue becomes a question of law
> reviewable de novo. Under this de novo standard, "we construe
> jury instructions as a whole to learn if they provided a full and
> correct statement of the law." *Id.* ¶40 (quoting State v. Frazier,
> 2001 SD 19, ¶35, 622 NW2d 246, 259 (citations omitted)).

*Id.* (internal footnote omitted). A circuit court's admission of expert testimony falls

within its broad discretion and is reviewed under the abuse of discretion standard.

*In re* Estate of Dokken, 2000 SD 9, ¶¶11, 39, 604 NW2d 487, 491, 498 (citations

omitted). A court's evidentiary rulings are presumed correct. They will not be

reversed absent a showing of a clear abuse of discretion. Steffen v. Schwan's Sales

Enter., Inc., 2006 SD 41, ¶19, 713 NW2d 614, 620 (citing Von Sternberg v. Caffee,

2005 SD 14, ¶13, 692 NW2d 549, 554 (citing *Dokken*, 2000 SD 9, ¶39, 604 NW2d at

498)).

## Analysis and Decision

### 1.  Jury Instruction on Error in Judgment

[¶14.]        Because the theory of Papke's case was that defendants were negligent in failing to refer her to a specialist, the court gave the jury the following instruction:

> It is the duty of a physician to refer a patient to a specialist or recommend the assistance of a specialist if, under the circumstances, a reasonably careful and skillful physician would do so.
>
> If the physician fails to perform that duty and undertakes to or continues to perform professional services without the aid of a specialist, it is a further duty to exercise the care and skill ordinarily used by specialists in good standing in the same field of specialization in the United States and under similar circumstances.

The court also instructed the jury on the applicable standard of care for a specialist:

> In performing professional services for a patient, a specialist in a particular field of medicine has the duty to possess that degree of knowledge and skill ordinarily possessed by physicians of good standing engaged in the same field of specialization in the United States.
>
> A specialist also has the duty to use that care and skill ordinarily exercised under similar circumstances by physicians in good standing engaged in the same field of specialization in the United States and to be diligent in an effort to accomplish the purpose for which the physician is employed.
>
> A failure to perform any such duty is negligence.

Instruction 16, the one challenged in this appeal, stated,

> A physician is not necessarily negligent because the *physician errs in judgment* or because efforts prove unsuccessful.
>
> The physician is negligent if the *error in judgment* or lack of success is due to a failure to perform any of the duties as defined in these instructions.

-7-

(Emphasis added). The jury was also instructed that "[t]he fact that an unfortunate or bad condition resulted to the patient does not alone prove" negligence.

[¶15.] Papke argues that the court's instructions on the "standard of care fully and accurately apprised the jury of the applicable law," and jury instruction 16, absolving defendants of negligence for an error in judgment, is an erroneous statement of the law. This instruction, she contends, unnecessarily supplants and dilutes the other standard of care instructions. Further, she believes the instruction is confusing and misleading, and injects a subjective element in what is clearly an objective standard of care for medical professionals. Papke asserts that because defendants' theory of the case focused on the error in judgment language and how defendants did not commit malpractice, but only erred in judgment, she was prejudiced by the instruction, warranting reversal and a new trial.

[¶16.] Defendants, on the other hand, assert that jury instruction 16 is a correct statement of the law because it was taken from "South Dakota Pattern Jury Instruction 105-01(C)." Defendants cite *Shamburger v. Behrens,* 380 NW2d 659, 663 (SD 1986) and *Magbuhat v. Kovarik*, 382 NW2d 43, 46 (SD 1986), where we examined the phrases "good faith error of judgment" and "bona fide error of judgment." According to defendants, this Court's holdings in *Shamburger* and *Magbuhat* demonstrate that the Court was concerned only with the terms "good faith" and "bona fide" and not with "error of judgment." *See* 380 NW2d at 663; 382 NW2d at 46. Thus, they argue that as long as the instruction refrains from including those phrases the error in judgment instruction is valid and consistent with this Court's past case law.

[¶17.] In *Shamburger*, the challenged instruction absolved the defendant of liability for a "good faith error of judgment." 380 NW2d at 663. We noted that this language came from our past cases, which declared that "[a] physician is not an [e]nsurer of the correctness of his judgment" and "is not liable for . . . a bona fide error of judgment of which he may be guilty." *Id.* (quoting Block v. McVay, 80 SD 469, 475-76, 126 NW2d 808, 811 (1964) (additional citation omitted)). We recognized that several courts have reexamined the use of this language and "have held that the use of such terms as 'honest mistake,' 'bona fide error in judgment,' or 'good faith error of judgment' have no place in medical malpractice instructions." *Id.* Quoting a case from the Connecticut Supreme Court, we stated,

> "[T]o use such a phrase in a charge upon negligence serves only to confuse the jury by implying that only an error of judgment made in bad faith can be actionable. The central issue in the ordinary negligence case is whether the defendant has deviated from the required standard of reasonable care, not his mental state at the time of the conduct[.]"

*Id.* (quoting Logan v. Greenwich Hosp. Ass'n, 465 A2d 294, 303 (Conn 1983)). Consequently, we held that instructions containing the phrase "good faith error of judgment" should no longer be given. *Id.*

[¶18.] The same year, in *Magbuhat*, we examined the phrase "bona fide error in judgment." 382 NW2d at 46. After recognizing that "[t]he negligence standard for doctors is no different than that for other professionals" we stated,

> The issue on which the jury should be instructed in a medical malpractice action is whether the doctor deviated from the required standard of care. That deviation is not conditioned on bad faith or the physician's state of mind at the time of the alleged negligence.

*Id.* Therefore, we declared the "bona fide error in judgment" instruction was also improper. *Id.*

[¶19.] *Shamburger* and *Magbuhat* make clear that medical malpractice jury instructions that contain the phrases "bona fide" or "good faith" are improper. However, we have never decided whether the use of "error in judgment" or similar language, not in conjunction with the terms "good faith" or "bona fide," would also be erroneous. Today, we address the question whether use of error in judgment or similar language is contrary to South Dakota law.

[¶20.] Papke directs us to cases from other jurisdictions that have held that use of error in judgment or any similar language is inappropriate. Defendants, in turn, cite cases that hold such language is proper in medical malpractice actions. In examining out-of-state jurisprudence on the issue, we note that not all error in judgment instructions are phrased identically. However, as stated in *Parodi v. Washoe Medical Center, Inc.*, "any instruction specifying nonliability for certain errors in judgment, or the applicability of 'honest' or 'best' judgment, may fall under the rubric of 'error-in-judgment.'" 892 P2d 588, 591 (Nev 1995). Therefore, we examine the cases that analyze instructions that fit under the error in judgment rubric.

[¶21.] It appears that there are essentially three prevailing views. Some courts categorically disallow the use of error in judgment or similar language in all circumstances.[2] Others only allow the language if it is first determined that an

---

2.   Jefferson Clinic, P.C. v. Roberson, 626 So2d 1243, 1247 (Ala 1993); Sleavin v. Greenwich Gynecology and Obstetrics, P.C., 505 A2d 436, 440 (Conn 1986);

(continued . . .)

evidentiary basis exists to do so, depending on the particular facts of the case.[3]  The remaining courts permit the use of error in judgment or similar language, as long as the instruction does not contain terms such as "good faith" or "bona fide."[4]

### A. "Error in Judgment" Instruction Improper

[¶22.]       We begin our analysis with those decisions that have declared the use of error in judgment or similar language improper in jury instructions for any medical malpractice case.  In *Rogers*, 772 P2d at 930-32, the Oregon Supreme Court reviewed the history of the error in judgment terminology.  It observed that this language "derives in part from the notion that a doctor does not promise a cure and that an untoward result might not be the result of negligence." *Id.* at 930 (citing Hills v. Shaw, 137 P 229, 230 (Or 1913); Langford v. Jones, 22 P 1064, 1070 (Or 1890)).  The language, the court stated, "stems in part from the recognition that if there is more than one acceptable treatment option, then selection of any one of

---

(. . . continued)
    Hirahara v. Tanaka, 959 P2d 830, 834 (Hawaii 1998); Peters v. Vander Kooi, 494 NW2d 708, 712 (Iowa 1993); Bickham v. Grant, 861 So2d 299, 303 (Miss 2003); *Parodi*, 892 P2d at 591 n3;  Rogers v. Meridian Park Hosp., 772 P2d 929, 933 (Or 1989); Yates v. Univ. of West Virginia Bd. of Trustees, 549 SE2d 681, 689 (WVaCtApp 2001); Rooney v. Medical Center Hosp. of Vermont, Inc., 649 A2d 756, 760 (Vt 1994).

3.    Borja v. Phoenix General Hosp., Inc., 727 P2d 355, 357-58 (ArizCtApp 1986); Ouellettee v. Subak, 391 NW2d 810, 816 (Minn 1986); Das v. Thani, 795 A2d 876, 881-82 (NJ 2002); Patterson v. Hutchens, 529 NW2d 561, 566 (ND 1995); Francoeur v. Piper, 776 A2d 1270, 1274-75 (NH 2001); Nestorowich v. Ricotta, 767 NE2d 125, 128-29 (NYCtApp 2002); Vallone v. Creech, 820 A2d 760, 764-65 (Pa 2003); Kobos v. Everts, 768 P2d 534, 537-38 (Wyo 1989).

4.    Rainer v. Cmty. Mem'l Hosp., 18 CalApp3d 240, 259 (CalCtApp 1971); DiFranco v. Klein, 657 A2d 145, 148-49 (RI 1995); Ezell v. Hutson, 20 P3d 975, 976-77 (WashCtApp 2001).

them is not negligence [and] a doctor is not liable for untoward results if he or she used reasonable care in selecting one of those options."[5]  *Id.* at 930-31 (citation omitted).

[¶23.]     The *Rogers* court noted that multiple jurisdictions have disapproved of the instruction, either partly or entirely.  *Id.* at 932 (citing *Logan*, 465 A2d at 303 (invalidating the "bona fide error in judgment" language); Watson v. Hockett, 712 P2d 855 (WashCtApp 1986), *aff'd*, 727 P2d 669 (Wash 1986) (error in judgment language is improper)).  Using the rationales from these decisions, the Oregon court held that use of the error of judgment instruction, even without the phrase "good faith," was no longer proper for any medical malpractice action.  *Id.* at 933.  Such language, the court wrote, "suggest[s] that the physician's duty to 'exercise reasonable judgment' turns on the existence of 'reasonable differences of opinion.'"  *Id.*  This is "incorrect" because "[t]he obligation to exercise reasonable judgment *always exists*, whether or not 'there may be reasonable differences of opinion among members of the medical community as to . . . the proper course of treatment.'"  *Id.* (emphasis added).

[¶24.]     In specific regard to the use of the phrase "error of judgment," the court declared that it

_____

5.     In 1984, use of the phrase "good faith" along with the error of judgment instruction was invalidated because "'good faith' in the instruction confused matters and had no place in an action for ordinary medical negligence."  *Id.* at 932 (citing Ellis v. Springfield Women's Clinic, P.C., 678 P2d 268, 270 (OrCtApp 1984), *rev. denied*, 683 P2d 91 (Or 1984).  Then, in *Rogers*, the court was asked to decide whether use of the error in judgment language, either in whole or in part, should also be prohibited.

> makes it appear that some types of negligence are not culpable. It is confusing to say that a doctor who has acted with reasonable care has nevertheless committed an *error* of judgment because untoward results occur. In fact, bad results notwithstanding, if the doctor *did not breach the standard of care*, he or she *by definition* has committed no *error of judgment*."

*Id.* (first emphasis in original) (remaining emphasis added). According to the court, "[t]he source of the problem is the use of the word 'error.'" *Id.* This is because "error" by definition could lead a jury to conclude that "a judgment resulting from an 'ignorant or imprudent deviation from a code of behavior' is not a breach of the standard of care." *Id.* (quoting Webster's Third New International Dictionary 772 (unabridged 1971)). Moreover, the court opined that "[i]f the term 'judgment' refers to choices between acceptable courses of treatment, then the term 'error in judgment' is a contradiction in itself [and using] any acceptable alternative would not be an 'error.'" *Id.* Thus, the court held that error in judgment or any similar language would no longer be permitted in Oregon medical malpractice actions.

[¶25.] Relying on the Oregon Supreme Court's rationale in *Rogers*, the Hawaii Supreme Court held that "any jury instruction that states that a physician is not necessarily liable for an 'error in judgment' is confusing and misleading and should not be given to the jury." *Hirahara*, 959 P2d at 834 (citing *Rogers*, 772 P2d at 933). Even though the court recognized that "[i]t is not negligent for a physician, based on the knowledge that he reasonably possess at the time, to select a particular course of treatment among acceptable medical alternatives[,]" it declared that "it is a breach of the duty of care for a physician to make an erroneous choice if, at the time he made the choice, he should have had the knowledge that it was

erroneous." *Id.* The court held that a different jury instruction, which explained to the jury that the physician would not be liable simply because a bad result occurred, adequately stated the law, when used in conjunction with the applicable standard of care instruction. *Id.* The court further wrote that use of "best judgment" language was similarly confusing and should no longer be used. *Id.* at 835.

[¶26.] The Iowa Supreme Court also disapproved of an instruction that informed the jury that "[a]n unsuccessful effort, mistake, or error in judgment by a physician is not necessarily negligence but is a circumstance to be considered." *Peters*, 494 NW2d at 711-12. The court took issue with other instructions, such as,

> [T]he defendant cannot be found negligent merely because of a mistake in the treatment of his patients. Any error in treatment, if you find any, does not in and of itself constitute negligence. For the defendant to be found negligent, it must be shown by a preponderance of the evidence that the defendant, in treating the patient's condition, failed to use the degree of skill, care and learning ordinarily possessed and exercised by other general family practitioners in similar circumstances, as explained to you in Instruction No. 13.
> . . .
> [T]he defendant cannot be found negligent merely because of a mistake in the diagnosis of his patients. Any error in diagnosis, if you find any, does not in and of itself constitute negligence. For the defendant to be found negligent, it must be shown by a preponderance of the evidence that the defendant in diagnosing the patient's condition, failed to use the degree of skill, care and learning ordinarily possessed and exercised by other general family practitioners in similar circumstances, as explained to you in Instruction No. 13.

*Id.* at 712. These instructions, the court held, "are not statements of the law that determine a physician's duty of care." *Id.* Rather, "[t]hey are comments on potential factual scenarios in which the standard of care may or may not have been adhered to [and] amount to comments on the evidence, which were determined in

*Hutchinson* [*v. Broadlawns Medical Center*, 459 NW2d 273, 276-77 (Iowa 1990)] to be unnecessary for the jury's determination of the issues." *Id.* As in *Hutchinson,* the Iowa Supreme Court reiterated its mandate that these instructions not be given in the future. *Id.*

[¶27.] The West Virginia Court of Appeals was asked to decide whether use of the "multiple methods of treatment" or "mistake in judgment" instructions were permitted. *Yates*, 549 SE2d at 688-90. In the first regard, the court held that the multiple methods of treatment instruction was proper. *Id.* The instruction, the court stated, "is a necessary recognition that the practice of medicine is an inexact science often characterized by a myriad of therapeutic approaches to a medical problem, all of which may command respect within the medical profession."[6] *Id.* at 688.

[¶28.] However, according to the court, the mistake in judgment instruction was improper, because the West Virginia Supreme Court had already disapproved of the use of "error in judgment." *Id.* at 690 (citing Pleasants v. Alliance Corp., 543

---

6.     The instruction states,

> A doctor is not negligent if he selects one of several or more approved methods of treatment within the standard of care. In other words, if there is more than one generally recognized method of diagnosis or treatment and no one method is used exclusively or uniformly by all physicians, a physician is not negligent if, in the exercise of his medical judgment, he selects one of the approved methods within the standard of care-even if you believe in retrospect that the alternative chosen may not have been the best method of treatment-as long as he utilizes that method of treatment in a non-negligent manner as otherwise instructed by the Court.

   *Id.*

SE2d 320, 331 (WVa 2000)).[7]  Such language, the court held, "wrongly injects subjectivity into an objective standard of care, [and] is argumentative and misleading[.]"  *Id.*  The court specifically held that the mistake in judgment language should no longer be used when instructing the jury in medical malpractice actions.  *Id.*

[¶29.]     The Connecticut Supreme Court first examined the use of "bona fide error in judgment" in *Logan*, where it noted that in the past use of bona fide or other similar language had been acceptable.  465 A2d at 298-99 (citing Green v. Stone, 185 A 72 (Conn 1936); Levett v. Etkind, 265 A2d 70 (Conn 1969)).  In *Logan*, however, the court declared that such language implies "that only an error in judgment made in bad faith may be actionable[.]"  *Id.* at 303.  Therefore, it held that the controlling standard of care is ordinary negligence.  *Id.* (citing Restatement (Second) Torts § 463 cmt b).

[¶30.]     Then in *Sleavin*, 505 A2d at 440, the court focused specifically on the use of an "error in judgment charge."  The plaintiff had challenged multiple provisions used by the trial court when it instructed the jury.  *Id.* at 438.  In examining the instructions on appeal, the Connecticut Supreme Court focused on the following phrases, "*He is not to be judged by the result, nor is he necessarily to be held liable for an error in judgment*" and "*The rule that an obstetrician/gynecologist is not liable for a mistake of judgment is not ironclad[.]*"  *Id.* at 438 (emphasis in

---

7.     In *Pleasants*, the court found the instruction to be erroneous, but did not reverse because it concluded that the error was harmless.  543 SE2d at 331-32.

original).  Recognizing that the primary function of a jury instruction is to assist the jury in applying the correct law to particular facts, the Connecticut court held that the language used by the lower court was an erroneous statement of the law.[8]  *Id.* at 440.

[¶31.]      According to the Vermont Supreme Court, the original intent of the best judgment or error in judgment instruction—to inform the jury "that a doctor may choose among several proper alternatives, even though the one chosen leads to an unfortunate result—is not self-evident."  *Rooney*, 649 A2d at 760.  Even though the court recognized that it had "upheld instructions that tend to explain what the standard of care is not," it declared that the use of best judgment or mere error in judgment was not in accord with the applicable objective standard of care.  *Id.* (internal citation omitted).  Moreover, recognizing that multiple jurisdictions have similarly rejected the error in judgment instruction, as well as the use of the word "judgment," the court held that use of the error in judgment language was also erroneous.  *Id.* at 761.

[¶32.]      The Nevada Supreme Court, in reviewing whether an error of judgment or best judgment instruction was proper, recognized that the instruction derived from California.  *Parodi*, 892 P2d at 591 n3.  The court, however, now believed that the instruction "may confuse jurors into focusing on the health care provider's subjective intentions and judgments rather than on the real issue of whether the health care provider's conduct conformed to an objective standard of

---

8.      The court did, however, review the instructions as a whole and determined that the erroneous instructions were harmless.  505 A2d at 441.

care." *Id.* at 591. Therefore, the court invalidated future use of the instruction and expressed its agreement with the "growing number of courts that have rejected the error-in-judgment instruction." *Id.* (also noting that one jurisdiction abandoned the use of "honest," but not yet error in judgment in its entirety).

[¶33.] In *Day*, the Mississippi Supreme Court held that use of mere error of judgment language has no place in medical malpractice actions. 657 So2d at 815. The court disapproved of the use of the word "error" because none of the "generally known" definitions of the word "comport with the language in [the] standard of care requiring a physician to maintain a certain level of competence." *Id.* at 814. The "generally known" definitions were important to the court because ordinary dictionary definitions for the word "error" are "necessary to explain the everyday meaning attached to words, reflecting the notions a jury might hold." *Id.* at 814.

[¶34.] The Mississippi court then explained that just because an instruction does not use the word "error," the use of "judgment" in connection with other words can nevertheless lead to a subjective jury instruction. *Bickham*, 861 So2d at 303. In *Bickham*, the court examined whether use of "in the exercise of their best judgment" was proper. *Id.* It declared that this instruction produced a negative effect on the plaintiff's case, and placed juries in the position of "assessing the mental state of treating physicians[.]" *Id.* Simply because the word "error" was omitted, the court held, did not lead to a different conclusion. *Id.* Rather, juries were to be instructed on the appropriate standard of care for medical malpractice actions, which "is objective and centers around exercising the degree of care, diligence and skill ordinarily possessed and exercised by a minimally competent and

reasonably diligent, skillful, careful, and prudent physician in that field of practice."
*Id.*

[¶35.]     Finally, the Alabama Supreme Court in *Jefferson Clinic, P.C.*, 626 So2d at 1247, held that to inject "subjective standards rather than objective standards into the jury's deliberative process clearly causes confusion." While previous courts were asked to examine instructions that appeared to limit liability for a medical care provider, the Alabama court was asked to review the opposite instruction. *Id.* at 1245. The instruction stated that "it is *no defense* for the defendant physician or defendant medical clinic that *errors, mistakes, acts, or omissions* of the defendant physician or the agents and employees of the defendant medical clinic were made in good faith or through an *error of judgment.*" *Id.* (emphasis added). Because the court had previously invalidated the use of the honest error charge to eliminate jury confusion, the court held that the opposite instruction was also improper, as it still created jury confusion. *Id.* at 1247.

## B. "Error in Judgment" Instruction Proper in Limited Circumstances

[¶36.]     We next review the rationale of those jurisdictions that allow the use of an error in judgment or similar instruction, provided that there exists an evidentiary basis to do so. The plaintiffs in *Ouellette*, 391 NW2d at 815 (citations omitted) questioned the appropriateness of the honest error rule, asserting that it potentially misleads, conflicts "with the ordinary care language suggesting a disjunctive standard of care for a physician," or "'confuses' the jury by implying only bad faith errors are actionable." The Minnesota Supreme Court noted that "[p]rofessionals are hired for their judgment and skill [and] . . . if the claim involves

a question of professional judgment, a choice of strategies or treatment, there may be a need . . . to caution the trier of fact in applying the standard of care to the professional's conduct." *Id.* at 815 (internal citation omitted). Therefore, the court stated,

> If there are *two methods of treatment* for a particular medical condition*, both accepted by the medical profession*, then it is a matter of professional opinion or judgment which is best, and the doctor's choice of either is, ordinarily, not negligence.

*Id.* (emphasis added). Yet, the court, thereafter, held that the honest error in judgment language is inappropriate. The court instead proposed its own language for how a jury should be instructed in a medical malpractice action.[9] *Id.* at 816.

[¶37.] The Wyoming Supreme Court acknowledged that a physician is subject to the "standard of reasonable care." *Kobos*, 768 P2d at 538. However, the court explained that "[a]n error of judgment charge is appropriate in a case *where a doctor is confronted with several alternatives* and, in determining the appropriate treatment to be rendered, exercises his judgment by following one course of action in lieu of another." *Id.* at 538 (emphasis added) (citations omitted). The court

---

9.    The court's proposed instruction stated,

> A doctor is not negligent simply because his or her efforts prove unsuccessful. The fact a doctor may have chosen a method of treatment that later proves to be unsuccessful is not negligence if the treatment chosen was an accepted treatment on the basis of the information available to the doctor at the time a choice had to be made; a doctor must, however, use reasonable care to obtain the information needed to exercise his or her professional judgment, and an unsuccessful method of treatment chosen because of a failure to use such reasonable care would be negligence.

  *Id.* at 816.

declared that the instructions "must clearly reflect the factual situation presented in the case as well as the applicable law." *Id.* at 539 (citation omitted). For example, the court stated that when the plaintiff's theory involves "misdiagnosis non-action" as the basis for defendant's negligence, then the error in judgment jury instruction would be improper. *Id.*

[¶38.]     Similarly, in *Nestorowich*, 767 NE2d at 128, the New York Court of Appeals recognized that "[i]mplicit within the concept of due care is the principle that doctors must employ their 'best judgment in exercising . . . skill and applying [their] knowledge.'" *Id.* (citations omitted). Therefore, according to the court, collateral doctrines such as the error in judgment instruction would be

> appropriate *in instances where parties present evidence of a choice between or among medically acceptable alternatives or diagnoses.* Absent a showing that "defendant physician considered and chose among several medically acceptable alternatives" the error in judgment charge has been found inappropriate.

*Id.* at 129 (emphasis added) (internal citations omitted). The court wrote,

> This limited application of the error in judgment charge preserves the established standard of care. Broader application of the charge would transform it from a protection against second-guessing of genuine exercises of professional judgment in treatment or diagnosis into a cloak for professional misfeasance. The doctrine was intended to protect those medical professionals who, in exercising due care, choose from two or more responsible and medically acceptable approaches. A distinction must therefore be made between an "error in judgment" and a doctor's failure to exercise his or her best judgment. Giving the "error in judgment" charge without regard for this distinction would otherwise relieve doctors whose conduct would constitute a breach of duty from liability.

*Id.* at 129. The facts of *Nestorowich*, however, were not "based on an alleged error of judgment" and the plaintiffs did not "urge that defendant's mistake was an 'error

of judgment' occasioned by a choice between two or more medically acceptable treatment alternatives." *Id.* at 130. Therefore, the court held that the instruction was improper. *Id.*

[¶39.] The Arizona Court of Appeals similarly allowed an instruction that used the "error in judgment" or "two schools of thought" language. *Borja*, 727 P2d at 357. The court observed that the instruction informed the jury that "a doctor does not commit malpractice simply because he employs a method of diagnosis or a course of treatment that some doctors do not find efficacious. So long as a respectable minority of physicians approve the disputed technique and so long as the defending doctor properly employed that technique, he has not fallen below the standard of care." *Id.* (citation omitted). Therefore, in cases where there is "testimony evidencing a conflict of methodology," the court held that the instruction would be proper. *Id.* at 358.

[¶40.] New Jersey does not employ the precise error in judgment language in its jury instructions; however, in *Das*, 795 A2d at 882-83, the New Jersey Supreme Court examined the appropriateness of using the phrase "medical judgment." In allowing the instruction, the court imposed the duty on the trial court to "analyze the parties' testimony and theories in detail, on the record, to determine whether the [medical judgment] charge is applicable at all and, if so, to which specific issues." *Id.* at 883. According to the court, "a medical judgment charge that does not specify what action may qualify as an appropriate exercise of judgment may result in an overly broad charge that has 'the potential to improperly insulate

defendants from liability.'"[10] *Id.* (citing Velazquez v. Portadin, 751 A2d 102, 107-08 (NJ 2000)).

[¶41.] In 2003, the Pennsylvania Supreme Court examined whether it was proper for the lower court to grant a new trial because the court provided a mere error in judgment instruction. *Vallone*, 820 A2d at 765. The court held that the mere error in judgment charge confused the jury and was not supported by the evidence. Because trial courts "should not charge the jury on a concept that is not supported by the evidence" the court declared that it was appropriate for the lower court to order a new trial. *Id.* (citation omitted). However, in Pennsylvania, courts are permitted to instruct the jury on the two schools of thought theory, which explains that "'[w]here competent medical authority is divided, a physician will not

---

10. For example, the court stated, with respect to the facts of *Das*, that

> the jury first should have been instructed that if it believed plaintiff's expert that defendant deviated from the standard of care by not monitoring plaintiff's pregnancy with ultrasounds, electronic fetal monitoring and biophysical profiles, then it may not excuse defendant's omissions as medical judgment. Conversely, if it believed defendant's expert that maternal fetal monitoring complied with the standard of care, then the selection of one of two generally accepted courses of treatment was an exercise of medical judgment for which defendant could not be liable. Stated differently, the jury should have been instructed that in order for defendant to prevail based on the exercise of medical judgment, the jury had to find that maternal fetal monitoring represented an equally acceptable approach to the other, more modern alternatives. The jury instructions must incorporate the evidence and the legal theories of liability and make clear that medical "judgment does not represent a departure from the requirements of accepted medical practice." Schueler [v. Strelinger,] 204 A2d 577[, 585 (NJ 1964).] That is the only way to make clear to a jury what action may qualify as an acceptable exercise of medical judgment.

*Id.* at 883-84.

be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of recognized and respected professionals in his given area of expertise.'" *Jones v. Chidester*, 610 A2d 964, 969 (Pa 1992). In such cases, *the defendant*, not the plaintiff, has the burden of proving that there are two schools of thought warranting the use of such instruction. *Id.*

[¶42.] In North Dakota, the Supreme Court held that because there was evidence that the physician had to choose between one of several treatment alternatives, the error in judgment instruction was proper. *Patterson*, 529 NW2d at 566. The court also upheld the use of the instruction because "the trial court's 'error in judgment' language was adequately explained in the challenged instruction."[11] *Id.*

[¶43.] Lastly, in *Francoeur*, 776 A2d at 1274, the New Hampshire Supreme Court noted that when a doctor exercises due care, that may permit him or her "to exercise judgment in choosing among several courses of treatment." Therefore, the court agreed that "when *various methods of treatment for a particular medical*

---

11. The instruction stated,

> In administering to his patient, a physician must be free to exercise reasonable judgment and is not liable for an error in judgment not arising from his negligence.
>
> When there is reasonable doubt as to what should be done in accordance with reasonable current practice, he is not responsible for a reasonable decision which turns out to be erroneous. However, this error in judgment does not extend to a case in which the situation precipitating the erroneous decision occurs because of the doctor's lack of the knowledge which he should possess or the failure to exercise that degree of skill and care which it is his duty to apply.

*Patterson*, 529 NW2d at 566.

*condition exist*, all of which meet the standard of reasonable professional practice, then choosing the best method is a matter of professional judgment." *Id.* (emphasis added). However, the court held that "[b]ecause the 'mere error of judgment' instruction is reasonably capable of confusing or misleading the jury regarding the reasonable standard of professional practice and whether defendant failed to act in accordance with that standard," the instruction was not proper. *Id.* at 1275.

### C. "Error in Judgment" Instruction Proper

[¶44.] We now examine the rationale of those jurisdictions that have adopted the third view—allowing the use of error in judgment or similar language in a medical malpractice action. In *Ezell*, 20 P3d at 976, the Washington Court of Appeals stated that "Washington courts have long approved the use of an 'error of judgment' instruction in medical malpractice cases." It did, however, recognize that the use of "honest" in conjunction with error in judgment had been prohibited because it "impart[s] 'an argumentative aspect into the instruction' and erroneously suggest[s] that only 'dishonest' errors [are] actionable." *Id.* at 976-77 (citing *Watson*, 727 P2d at 673-74). Nevertheless, the court held that the use of an error in judgment instruction was proper because it reinforced that "medicine is an inexact science in which results are not guaranteed and professional judgment may reasonably differ." *Id.* (citing *Watson*, 727 P2d at 673-74).

[¶45.] The Rhode Island Supreme Court stated that "as long as a physician exercises the applicable degree of care, he or she may choose between differing but accepted methods of treatment and not be held liable." *DiFranco*, 657 A2d at 148 (citations omitted). This, the court explained, "has become known as the 'medical

judgment' or 'error in judgment' doctrine." *Id.* The court further declared that "because a physician's professional judgment is such a fundamental and indispensable element of practicing medicine," it is permissible to give an instruction that states that the physician "is not negligent in choosing a treatment that later proves to be unsuccessful so long as the treatment chosen was an appropriate treatment based on the information then available to a reasonably prudent doctor in like circumstances." *Id.* (citing Barker v. Lane, 49 A 963 (RI 1901); Coleman v. McCarthy, 165 A 900, 902 (RI 1933); *see also Oullette*, 391 NW2d at 816). However, the court expressly held that use of phrases such as "good faith," "good faith judgment," "honest mistake," and "honest error in judgment" should not be used. *Id.* These phrases, the court stated, erroneously imply "that only dishonest or bad-faith deviations from the applicable standard of care constitute actionable negligence." *Id.* (citations omitted).

[¶46.]    Lastly, California explicitly allows the use of an error in judgment instruction. Fraijo v. Hartland Hosp., 99 CalApp3d 331, 342-43 (CalCtApp 1979); *Rainer*, 18 CalApp3d at 260. The language is set forth in its pattern jury instructions and has been repeatedly upheld by the courts. *See Fraijo*, 99 CalApp3d at 342-43; *Rainer,* 18 CalApp3d at 260. However, it is important to point out that California imposes a separate professional negligence standard of care different than ordinary negligence.[12] Flowers v. Torrance Mem'l Hosp. Med. Ctr., 884 P2d

---

12.    For other professional malpractice cases besides medical malpractice, California permits the error in judgment instruction, as follows:

> [A] [An] _____ is not necessarily negligent because [he] [or] [she] *errs in judgment* or because [his] [or] [her] efforts prove

(continued . . .)

142 (Cal 1994) (discussing the existence of a professional standard, yet noting that the distinction "merely serves to establish the basis by which [the standard] will be calculated and the defendant's conduct evaluated"). In accordance with California Pattern Jury Instructions, courts are permitted to instruct juries in medical malpractice actions that

> [a] physician is not necessarily negligent because [he] [or] [she] *errs in judgment* or because [his] [or] [her] efforts prove unsuccessful. The physician is negligent if the error in judgment or lack of success is due to a failure to perform any of the duties as defined in these instructions.

California Civil Jury Instructions (BAJI 6.02 "Medical Perfection Not Required") (emphasis added).

### D. "Error in Judgment" in South Dakota Should Be Limited

[¶47.]        Although we have examined the three general views adopted on this issue, there are also multiple jurisdictions that have settled on a position that does not clearly fit within one of these three categories. *See* Somer v. Johnson, 704 F2d 1473, 1477 (11thCir 1983); Riggins v. Mauriello, 603 A2d 827, 830-31 (Del 1992); Hartman v. Shallowford Cmty. Hosp., Inc., 466 SE2d 33, 36 (GaCtApp 1995); Wall v. Stout, 311 SE2d 571, 577 (NC 1984); Kurzner v. Sanders, 627 NE2d 564, 567

_____

(. . . continued)

> unsuccessful. However, [a] [an] _____ is negligent if the error in judgment or lack of success is due to a failure to perform any of the duties as defined in these instructions.

> *Id.* (quoting BAJI 6.37.2 "Professional Perfection Not Required") (emphasis added).

(OhioCtApp 1993).[13]  These cases are similar to this Court's holding in *Shamburger*

---

13.  In *Somer*, the Eleventh Circuit Court of Appeals explained that after the Florida Supreme Court Committee on Standard Jury Instructions adopted an instruction setting forth the standard of care for physicians, which did not include error in judgment or similar language and the committee "condemned" the error in judgment language, Florida appellate courts began to express their disapproval of the honest error of judgment and similar instruction language.  704 F2d at 1477 (citations omitted).  Therefore, the court concluded that the use of the "honest error of judgment instruction" was improper.  *Id.*

The Delaware Supreme Court examined the use of the mere error of judgment language under the plain error doctrine because the plaintiff did not object to the instruction before the jury was charged.  *Riggins*, 603 A2d at 830-31.  After examining the particular instruction challenged, the court held that by using "the 'mere error of judgment' charge a jury could too readily conclude, incorrectly, that a physician is not liable for malpractice even if he or she is negligent in administering the treatment selected."  *Id.* at 831.

The Georgia Court of Appeals disapproved of an instruction that provided that a physician is not responsible "for a lack of success or an honest mistake or an error in judgment[.]"  *Hartman*, 466 SE2d at 35.  The court drafted the instruction the jury should have received.  In that instruction, nothing excuses a physician from liability for an "error," "mistake," or judgment call.  Rather, the controlling instruction sets forth the applicable standard of care.

The North Carolina Supreme Court did not specifically address whether the error in judgment or similar language was appropriate.  However, it expressly held that use of "honest error" is "potentially misleading and exculpatory" and, therefore, "inappropriate in an instruction on the liability of a doctor for medical malpractice[.]"  *Wall*, 311 SE2d at 577.

The Ohio Court of Appeals examined an instruction that used "honest error" or "mistake in judgment" and discussed the inappropriateness of the use of "judgment" in a jury instruction.  *Kurzner*, 627 NE2d at 567.  "Judgment", according to the court, "interposes subjectivity into standards which are supposed to be objective[.]"  *Id.*  Therefore, use of such terms should not be used in medical malpractice cases.  However, in several unpublished appellate court decisions, it appears that use of "honest error" or "mistake in judgment" is proper as long as the instructions as a whole inform the jury of the appropriate standard of care.  *See* Nash v. Hontanosas, 2002 WL 553754 (OhioCtApp 2002) (unpublished); Faber v. Syed, 1994 WL 326151

(continued . . .)

and *Maghuhat*, where we did not specifically hold that error in judgment or similar language should never be used. *See* 380 NW2d at 663; 382 NW2d at 46. While *Shamburger* ruled "that the use of such terms as '*good faith error in judgment*' unduly confuses the issues in a negligence action," the analysis focused on the terms "good faith." 380 NW2d at 663 (emphasis added). Similarly, in *Maghuhat*, the analysis examined the appropriateness of the terms "bona fide" even though we declared that "[t]he negligence standard for doctors is no different than that for other professionals." 382 NW2d at 46 (citing Lenius v. King, 294 NW2d 912 (SD 1980) (applying negligence standard to an attorney)).

[¶48.]	Because a physician's standard of care is no different than that of other professionals, the concerns we expressed in *Shamburger* and *Maghuhat* will not be alleviated if we approve the use of error in judgment or similar language in jury instructions. It is misleading to instruct a jury that physicians are not negligent when they make an error in judgment. As multiple courts have recognized, if the physician did not breach the applicable standard of care, then he or she by definition has not committed an error in judgment. *See Rogers*, 772 P2d at 933; *Hirihara*, 959 P2d at 834; *Day*, 657 So2d at 815.

[¶49.]	While the original intent of the instruction was to inform the jury that a doctor exercises medical judgment when treating a patient, and poor results would not necessarily mean negligence, that intent is not explained with the use of

_____

(. . . continued)
    (OhioCtApp 1994) (unpublished); Kosmos v. The Cleveland Elec. Illuminating Co., 1991 WL 281035 (OhioCtApp 1991) (unpublished).

error in judgment or similar language. By using the term error in judgment, a jury could reasonably find a physician not liable in instances where that physician discloses that in hindsight, yes, he or she made a mistake, but that it was only an error in judgment. This is not the standard of care physicians are held to in South Dakota.[14]

[¶50.]     Because error in judgment or any similar language in no way further defines or explains the applicable standard of care to the jury, we hold that such language should not be used in ordinary medical malpractice actions.[15] This,

14. Although our jury instructions are many times modeled after California's pattern jury instructions, in this particular instance, California's instruction should not be cited. California, unlike South Dakota, allows an error in judgment instruction to be used in all professional malpractice actions. *See supra* note 12.

15. There may be limited occasions when an error in judgment instruction may still be used. Because medicine is not an exact science and because a physician in some instances may be presented with multiple methods of acceptable treatment for a particular condition, a physician must be allowed to exercise his or her professional judgment. Therefore, there may be instances in which a jury may be instructed that the physician's choice of treatment from multiple acceptable treatments available is not necessarily negligence. Such instruction, however, cannot propose that the physician may commit a mere error or mistake and not be liable. A proper instruction might contain language similar to the one approved by the Minnesota Supreme Court:

> If there are two methods of treatment for a particular medical condition, both accepted by the medical profession, then there is a matter of professional opinion or judgment which is best, and the doctor's choice of either is, ordinarily, not negligence.

*See Ouellette*, 391 NW2d at 815. This instruction along with the applicable standard of care instruction will sufficiently inform the jury that a doctor must (1) act in accordance with the standard of care, and (2) when multiple medically acceptable methods of treatment exist, the physician's treatment is not necessarily negligence when he or she chooses one of those methods. Moreover, courts are still permitted to instruct a jury that "[t]he fact that an

(continued . . .)

however, does not end our inquiry. Even though jury instruction 16 was erroneous, for it to constitute reversible error, Papke must establish that the instruction was prejudicial. *See Vetter*, 2006 SD 21, ¶10, 711 NW2d at 615 (citing *First Premier Bank*, 2004 SD 92, ¶40, 686 NW2d at 448). An instruction is prejudicial when "in all probability [it] produced some effect upon the verdict and [was] harmful to the substantial rights of a party." *Id.*

[¶51.]       Papke contends that because the defendants centered their defense on the error in judgment language, she was prejudiced by the instruction. Indeed, defense counsel told the court during settlement of jury instructions that the error in judgment instruction was critical to their case. In closing argument, defense counsel drew the jury's attention to this instruction:

> So things were going along as Dr. Harbert thought they would. Unfortunately, as we know, he was wrong. And as he admitted, his diagnosis of them being pressure sores, something that would heal up, was wrong. But that did not, . . . make him negligent and mean that he has breached the standard of care.
>
> The instructions clearly say that an error in judgment does not necessarily amount to negligence. And doctors have to make a lot of tough calls. They make judgment calls, and that's what happened here. And in retrospect, yeah, it was wrong; but it's not negligent.

According to Papke, the instruction "appeared to absolve the defendants of any potential negligence even where, as in this case, the defendants admitted to misdiagnosing [her] condition." Therefore, she claims that this "in all probability

---

(. . . continued)
       unfortunate or bad condition resulted to the patient does not alone prove that the defendant was negligent."

affected the jury's application of the standard of care in this case," warranting a new trial.

[¶52.] We review the "instructions as a whole to learn if they provide a full and correct statement of the law." *Id.* ¶10 (quoting *First Premier Bank*, 2004 SD 92, ¶40, 686 NW2d at 448) (additional citations omitted). The court's remaining instructions properly informed the jury about the applicable standard of care. Yet, any influence the error in judgment instruction could have had on the jury's decision is compounded in light of the defendants' theory of their case. Defendants told the jury that in hindsight Dr. Harbert made a mistake, but then relied on the language of jury instruction 16 and claimed that such mistake cannot constitute negligence because an error in judgment is not negligence. Defendants argued to the jury that because of this instruction they were not negligent for their mistake. From our review of the record, we conclude that in light of the fact that the erroneous instruction was used as an integral part of defendants' theory, in all probability the instruction had some effect on the outcome of the case and prejudiced Papke's substantial rights, requiring a new trial.

## 2. Previously Undisclosed Expert Testimony

[¶53.] Papke next argues that the court erred when it admitted previously undisclosed expert testimony on the issue of causation. Defendants' expert, Dr. Devon Goetz, testified at trial that on November 22, 2002, Papke had a greater than fifty percent chance that she would have lost both her legs even if defendants had properly diagnosed her condition. This opinion on causation, Papke contends, was not disclosed to her until the morning Dr. Goetz testified. Therefore, she asserts

that she "was unable to conduct any investigation, prepare any effective cross examination, or retain an expert to disprove or counter that testimony in rebuttal."

[¶54.]    Defendants, however, insist that based on "the equities" in this case, Dr. Goetz's opinion was properly allowed.[16]  Defendants claim that on September 25, 2005, Papke had sent a late disclosure of her expert's intended opinions and the court remedied this by allowing defendants the opportunity to depose Dr. Michael Holte.  Because the court permitted Papke a similar opportunity to depose Dr. Goetz after the late disclosure and allowed her an opportunity for a continuance, the late disclosure was remedied.  Defendants further assert that for the expert testimony to be excluded, Papke must establish that there was willfulness or bad faith on the part of defendants and the lack of bad faith is conceded by Papke. Therefore, defendants assert that there was no unfair prejudice to Papke and the testimony was properly allowed.

[¶55.]    We recently addressed this issue in *Kaiser v. Univ. Physicians Clinic*, 2006 SD 95, 724 NW2d 186.  We recognized that the purpose of pretrial discovery is to allow "the parties to obtain the fullest possible knowledge of the issues and facts

---

16.    Defendants also claim that Papke failed to preserve this issue for appeal because after her motion to exclude was denied she failed to then object when questions on causation were asked of Dr. Goetz and defendants' second expert Dr. Jack Bert.  This contention is without merit.  The court's ruling to deny her motion is not akin to a motion in limine, which, under our former rule, required a subsequent objection for preservation on appeal.  Papke adequately preserved the issue when she made the motion to exclude the expert testimony.  The present rule is SDCL 19-9-3 (Rule 103(a)), which states in part:  "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." (Effective July 1, 2006).

before trial." *Id.* ¶31 (quoting Hickman v. Taylor, 329 US 495, 501, 67 SCt 385, 389, 91 LEd 451 (1947)). Therefore, a litigant is "under a duty to seasonably [] supplement [its] response with respect to any question directly addressed to . . . the subject matter on which [the litigant] is expected to testify, and the substance of this testimony." *Id.* ¶32 (emphasis omitted) (quoting SDCL 15-6-26(e)(1)). Under SDCL 15-6-37(b), sanctions may be imposed by a court for a party's failure to supplement responses. *Id.* ¶33 (citations omitted) (one sanction identified is to exclude the proffered testimony). The purpose of a sanction, the *Kaiser* Court recognized, is "'to compel production of evidence and to promote, rather than stifle, the truth finding process.'" *Id.* ¶34 (quoting Haberer v. Radio Shack, a Div. of Tandy Corp., 1996 SD 130, ¶20, 555 NW2d 606, 610) (additional citations omitted).

[¶56.] In *Kaiser*, we noted three areas of concern: (1) the time element and whether there was bad faith by the party required to supplement; (2) whether the expert testimony or evidence pertained to a crucial issue; and (3) whether the expert testimony differed substantially from what was disclosed in the discovery process. *Id.* ¶35 (citations omitted). We also recognized that SDCL 15-6-26(e) is modeled after Federal Rule 26(e) and focused on certain federal cases, which "have found reversible error when testimony is admitted without prior disclosure pursuant to Rule 26." *Id.* ¶38 (citing Smith v. Ford Motor Co., 626 F2d 784, 794 (10thCir 1980) (citing Voegeli v. Lewis, 568 F2d 89, 96 (8thCir 1977); Shelak v. White Motor Co., 581 F2d 1155 (5thCir 1978); Weiss v. Chrysler Motors Corp., 515 F2d 449 (2dCir 1975)). The remedy, according to those federal cases, was to exclude the proffered evidence when a party failed to seasonably supplement. *Id.* ¶39 (citations omitted).

[¶57.]     Here, as in *Kaiser,* all three areas of concern are present. *See id.* ¶35 (citations omitted). Dr. Goetz's opinion on causation was not disclosed during the discovery process. Not until the morning of his testimony was Papke notified that he even held an opinion on causation. In *Kaiser*, the expert expressed an opinion during the discovery process, but then in trial used new evidence to support that opinion, evidence that was untimely submitted. *See id.* ¶20. Here, Dr. Goetz gave no opinion on causation during the discovery process. His late revelation is more troubling than the one in *Kaiser. See id.* ¶35. Secondly, the issue of causation went to the heart of Papke's case, as she had to prove that defendants' conduct proximately or legally caused her injuries. Thus, the testimony pertained "to a crucial issue." *See id.* Finally, because Dr. Goetz did not have an opinion on causation during his deposition, and then expressed an opinion on causation at trial, his testimony differed substantially. *See id.*

[¶58.]     Although Papke was given an opportunity to depose Dr. Goetz immediately before his testimony at trial, this remedy conflicted with the purpose of SDCL 15-6-26(e). As we stated in *Kaiser,* the purpose of SDCL 15-6-26(e) is to provide all parties the opportunity to know the facts before trial. 2006 SD 95, ¶31, 724 NW2d at 194. Had Papke known that Dr. Goetz had an opinion on causation or that his opinion was that on November 22, 2002, the chances for her losing her legs, regardless of the diagnosis, was above fifty percent, her counsel could have examined the basis for that opinion and sought expert testimony in rebuttal. Even though the parties concede that no bad faith existed on the part of defense counsel, the protective nature of the statute is not dependent upon bad faith. Rather, SDCL

15-6-26(e) ensures a fair trial for all parties. Because Dr. Goetz's untimely opinion on causation was improperly allowed, Papke was denied a fair trial.[17]

### 3. Submission of Medical Expenses

[¶59.] By notice of review, defendants contend that a plaintiff's right to recover the "reasonable value" of medical services as a measure of damages does not include amounts "written off" by the medical care provider because of a contractual agreement between the provider and Medicare and Medicaid. Papke was billed $429,531.28 for her medical care. Medicare paid $79,411.72, and Medicaid paid $133,874.03. The remaining $216,874.03 was written off and will never be paid by anyone. Because neither Papke, nor anyone else, will ever be required to pay the amount written off, defendants assert that Papke should only be able to recover the amount that was actually paid for her medical services. Papke, on the other hand, argues that she is entitled to recover the "reasonable value" of her medical services as damages, notwithstanding what amount was actually charged or paid. Furthermore, relying on the collateral source rule, she contends that defendants are prohibited from offering in evidence the portion of her medical bills that were written off.

[¶60.] Whether a plaintiff in a medical malpractice case is entitled to recover the amount written off by a medical care provider because of a contractual agreement between the provider and Medicare or Medicaid has never been

---

17. Papke also challenges the reliability of Dr. Goetz's testimony, but because further discovery will undoubtedly occur on his opinions before this case is retried, we decline to rule on the issue at this time.

addressed by this Court. We have, however, examined whether a plaintiff is entitled to recover damages for the amount of medical services gratuitously provided. *Degen v. Bayman*, 90 SD 400, 241 NW2d 703 (1976).

[¶61.]    In *Degen*, the plaintiff received $13,490 in free care from the Shriners Hospital, which amount would never become due and owing against the plaintiff. *Id.* at 410, 241 NW2d at 708. When plaintiff brought a products liability action against a boat manufacturer, the defense alleged that plaintiff was not entitled to recover the $13,490 of gratuitous care, but only the amount actually paid by plaintiff. Applying the collateral source rule, the Court held "that where the victim of a [tortfeasor] receives gratuitous medical services from a source wholly independent of the [tortfeasor] the value of gratuitous medical services may not be deducted from the verdict for overall medical care received." *Id.* at 411, 241 NW2d at 709.

[¶62.]    We used the collateral source rule based on our holding in *Moore v. Kluthe & Lane Ins. Agency, Inc.*, 89 SD 419, 434, 234 NW2d 260, 269 (1975) (quoting Swift & Co. v. Gutierez, 277 P2d 559 (Idaho 1954) (citation omitted)). In *Moore,* we adopted the collateral source rule enunciated by the Idaho Supreme Court: "Total or partial compensation received by an injured party from a collateral source, wholly independent of the wrongdoer, does not operate to reduce the damages recoverable from the wrongdoer." *Id.* (citation omitted). Quoting the Tenth Circuit Court of Appeals, we held that "[n]o reason in law, equity or good conscience can be advanced why a wrongdoer should benefit from part payment from a collateral source of damages caused by his wrongful act. If there must be a

windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer shall be relieved of his full responsibility for his wrongdoing." *Id.* (quoting Grayson v. Williams, 256 F2d 61, 65 (10thCir 1958)).

[¶63.] Believing the "rule and the rationale behind it" were sound, the Court in *Degen* held that "a plaintiff who has been injured by the tortious conduct of the defendant is entitled to recover the reasonable value of medical and nursing services reasonably required by the injury. This is a recovery for their value and not for the expenditures actually made or obligations incurred." *Id.* at 410, 241 NW2d at 708 (citation omitted). Although Papke argues that the collateral source rule and *Degen* resolve the question here, the fact that this case involves medical malpractice presents a different situation from one involving traditional personal injury or products liability.

[¶64.] The Legislature, through two statutes, has chosen to put medical malpractice damages in a special category. First, in SDCL 21-3-11, the total general damages that can be awarded to a plaintiff in a medical malpractice action has been limited to five hundred thousand dollars. Second, contrary to the collateral source rule, in a medical malpractice action, where a plaintiff seeks an award of special damages, the Legislature has made admissible evidence that "is relevant to prove that any such special damages were paid for or are payable by, in whole or in part, insurance which is not subject to subrogation and which was not purchased privately, in whole or part . . . or were paid for, or are payable by, in whole or in part, state or federal governmental programs not subject to subrogation." SDCL 21-3-12.

[¶65.] In *Knowles v. United States,* we observed that by treating medical malpractice differently, the Legislature calculated that malpractice insurance rates would be reduced, thereby lowering the cost of health care to all citizens. 1996 SD 10, ¶¶60-62, 544 NW2d 183, 195-97 (Gilbertson, J., concurring in part, concurring in result, and dissenting in part); *see also* Peterson v. Burns, 2001 SD 126, 635 NW2d 556 (examining statutory restraints against medical malpractice claims). In line with the idea that medical malpractice is treated uniquely in South Dakota, today we examine whether, in a medical malpractice action, a plaintiff can recover as damages the portion of the medical expenses written off based on a contractual agreement between a medical care provider and Medicare or Medicaid.

[¶66.] Even though today's case is examined solely within the realm of medical malpractice, decisions outside the area of medical malpractice are instructive. Essentially, whether write offs should be recoverable implicates two concepts—the collateral source rule (when allowing recovery) and the notion that the object of a compensatory damage award is to make an injured party whole (in prohibiting recovery).

[¶67.] For those jurisdictions that have allowed recovery based on the collateral source rule, the courts have focused on the two purposes of the rule—one as a rule of evidence and the other as a rule of damages. Bozeman v. State, 879 So2d 692, 699 (La 2004) (recognizing that Medicare and private insurance write offs are recoverable, but not Medicaid write offs); Esposito v. O'Hair, 886 A2d 1197, 1204 (RI 2005) (statute abrogating collateral source rule in medical malpractice cases does not apply to Medicaid).

[¶68.] Applied as a rule of evidence, the collateral source rule prohibits defendants from offering proof of collateral source benefits received by the plaintiff, independent of the tortfeasor, which compensate the plaintiff, in whole or in part, for his or her injury. Calva-Cerqueira v. United States, 281 FSupp2d 279, 295-96 (DDC 2003) ("collateral source rule permits the plaintiff to recover all of his medical costs, regardless of any written-off amounts"); Montgomery Ward & Co., Inc. v. Anderson, 976 SW2d 382, 383 (Ark 1998) ("gratuitous or discounted medical services are a collateral source"); Baptist Healthcare Systems, Inc. v. Miller, 177 SW3d 676, 684 (Ky 2005) ("Medicare benefits are governed by the collateral source rule"); *Bozeman*, 879 So2d at 699; *Esposito*, 886 A2d at 1199-203; Covington v. George, 597 SE2d 142, 144 (SC 2004) (collateral source rule applies and prohibits introduction of actual amount paid to challenge the reasonableness of the medical expenses sought by plaintiff).

[¶69.] Applied as a rule of damages, the collateral source rule prohibits defendants from reducing their liability because of payments made to the plaintiff by independent sources. Bynum v. Magno, 101 P3d 1149, 1155 (Hawaii 2004) (Medicare/Medicaid write offs are akin to gratuitous services and therefore recoverable); Arthur v. Catour, 803 NE2d 647, 650 (IllCtApp 2004) (limiting recovery to amount paid "confers a significant benefit" to the defendant, "contrary to the collateral source" rule); Rose v. Via Christi Health System, Inc., 78 P3d 798, 806 (Kan 2003) ("[b]ecause health care providers voluntarily contract with Medicare . . . the benefit of the write-offs should be attributed to the Medicare participant rather than the health care provider"); *Bozeman*, 879 So2d at 699; *Esposito*, 886 A2d at

1199-204; Acuar v. Letourneau, 531 SE2d 316, 320-23 (Va 2000) (no deduction for amount written off because of contractual agreement between plaintiff's insured and health care providers); *see also* Lindholm v. Hassan, 369 FSupp2d 1104 (DSD 2005) ("reasonable value of medical service is not controlled by whether a portion or all of the medical bills [were] paid as a gift, or written off pursuant to an insurance agreement or by operation of law"); *see also* Brandon HMA, Inc. v. Bradshaw, 809 So2d 611 (Miss 2001) ("Medicaid payments are subject to the collateral source rule").

[¶70.]        Also, while it has been recognized that at times the collateral source rule can produce a windfall for a plaintiff, courts have held that if a windfall occurs, it is better that the innocent plaintiff receive it than the guilty wrongdoer. *Bynum*, 101 P3d at 1159-61; *Arthur*, 803 NE2d at 649-50; *Rose*, 78 P3d at 806; *Baptist Healthcare Systems, Inc.*, 177 SW3d at 683; *Acuar*, 531 SE2d at 323. This, courts have held, furthers the intent of the collateral source rule, which is to preclude a defendant, the tortfeasor, from obtaining any benefit when a plaintiff receives collateral payments or benefits, such as gratuitous services, insurance coverage payments, social policy benefits, etc. Moreover, a plaintiff is generally entitled to recover only the *reasonable value* of medical services provided**.** *See infra* note 18.

[¶71.]        Courts have also relied on the Restatement (Second) of Torts when deciding whether the reasonable value of medical services provided equals the amounts paid.[18] Restatement (Second) of Torts § 920A (entitled "Effect of

---

18.    The following courts examined Restatement (Second) of Torts, section 920A, in allowing the award of write offs. *Bynum*, 101 P3d at 1154; *Montgomery*

(continued . . .)

Payments to Injured Party"). Under the Restatement, "Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." *Id.* § 902A(2). The comments to the Restatement explain that "it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor." *Id.* § 920A cmt b. The comment continues, "If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers." *Id.* This is because "[t]he law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him."[19] *Id.*

[¶72.] In accordance with the intent of the collateral source rule and section 920A of the Restatement (Second) of Torts, multiple courts have further held that write offs are akin to gratuitous payments or are a benefit contracted for by the plaintiff through insurance coverage and are therefore recoverable.[20] The Kansas

_____

(. . . continued)
> *Ward & Co., Inc.*, 976 SW2d at 385; *Rose*, 78 P3d at 802; *Bozeman,*879 So2d at 701-02; *Acuar*, 531 SE2d at 323.

19. The Restatement further identifies those benefits for which the collateral source rule applies: insurance benefits, employment benefits, gratuities, and social legislation benefits. *Id.* § 902A cmt c.

20. Although not applicable to this case, when a plaintiff procures private medical insurance coverage and the insurance provider contracts with a healthcare provider for a lower rate, the plaintiff, not the defendant, should receive the benefit of that bargain. It is the plaintiff who pays the premium for the insurance coverage and the lower rates. *See Calva-Cerqueira*, 281 FSupp2d at 295-96; Lopez v. Safeway Stores, Inc., 129 P3d 487, 496

(continued . . .)

Supreme Court, in particular, compared Medicare to private insurance because

"Medicare benefits are purchased by payroll deductions[.]"[21] *Rose,* 78 P3d at 802-03

(Medicaid write offs are not recoverable); *see also Bynum*, 101 P3d at 1157;

*Bozeman,* 879 So2d at 704 (Medicaid write offs are not recoverable, but Medicare

write-offs are); Brown v. Van Noy, 879 SW2d 667, 676 (MoCtApp 1994) (without a

challenge to the reasonableness of the expenses, "the fact that the expenses were

'taken care of' by Medicare" is irrelevant); Robinson v. Bates, 828 NE2d 657, 673

(OhioCtApp 2005) ("the collateral-source rule applies to any written-off amount

agreed to by a plaintiff's health-care provider and insurer"). According to one court,

the windfall should benefit the injured party and the tortfeasor "should bear the full

liability of his or her tortious actions without regard to the injured parties' method

of financing his or her medical treatment." *Rose,* 78 P3d at 806.[22]

[¶73.]     Other courts, however, have denied recovery of write offs because the

object of a damage award is to compensate the plaintiff only to the full extent of the

plaintiff's injuries. *Hanif*, 200 CalApp3d at 641 (in consideration of the objective of

an award of damages, an award "in excess of what the medical care and services

_____

(. . . continued)
     (ArizCtApp 2006); *Arthur*, 803 NE2d at 649; *Covington*, 597 SE2d at 144;
     *Acuar,* 531 SE2d at 322; Koffman v. Leichtfuss, 630 NW2d 201, 208-10 (Wis
     2001).

21.    The court, however, recognized that Medicaid was dissimilar, in that it is
     provided free to all those who qualify. *Rose,* 78 P3d at 803.

22.    The court also distinguished the two cases primarily relied upon for
     disallowing recovery. *Id.* at 804 (citing Hanif v. Housing Auth., 200
     CalApp3d 635 (CalCtApp 1988); Moorhead v. Crozer Chester Med. Ctr., 765
     A2d 786 (Pa 2001)).

actually cost constitutes overcompensation"); Coop. Leasing, Inc. v. Johnson, 872 So2d 956, 958-59 (FlaCtApp 2004) (plaintiff only entitled to recover what was paid by Medicare, not what was billed); *Moorhead*, 765 A2d at 790 (allowing plaintiff to recover write offs "would violate fundamental tenets of just compensation").

[¶74.] Some courts also have denied a plaintiff recovery of amounts written off because a write off is not a "payment" received by a source independent of the tortfeasor, and, therefore, not a collateral source. Chapman v. Mazda Motor of America, Inc., 7 FSupp2d 1123, 1124-25 (DMont 1998) (plaintiff is not entitled to recover disallowed medical expenses); *Coop. Leasing Inc.,* 872 So2d at 959-60 (collateral source rule modified by statute to allow set off of damages); Dyet v. McKinley, 81 P3d 1236, 1239 (Idaho 2003) ("write-off is not technically a collateral source"); Peterson v. Lou Bachrodt Chevrolet Co., 392 NE2d 1, 5 (Ill 1979) (the value of gratuitous service provided by the Shriners Hospital is not recoverable because it is not a collateral source); Bates v. Hogg, 921 P2d 249, 252-53 (KanCtApp 1996) (Medicaid write off is not recoverable because it is not a collateral source), *superseded in statute as stated in*, Frans v. Gausman, 6 P3d 432 (KanCtApp 2000); Kastic v. U-Haul Co. of Western Michigan, 292 Ad2d 797 (NYCtApp 2002) (write off is not a payment from a collateral source); *Moorhead*, 765 A2d at 791 ("collateral source rule does not apply to the illusory 'charge'" written off).

[¶75.] Two frequently cited cases for denying a plaintiff recovery for write offs are *Hanif,* 200 CalApp3d at 640 and *Moorhead*, 765 A2d at 788. In *Hanif*, a California appellate court examined "whether the 'reasonable value' measure of

recovery means that an injured plaintiff may recover from the tortfeasor more than the actual amount he paid for or for which he incurred liability for past medical care and services." 200 CalApp3d at 640. It noted that the "*primary objective of an award of damages* in a civil action, and the fundamental principle on which it is based, are *just compensation* or indemnity for the loss or injury sustained by the complainant, *and no more.*" *Id.* 640-41 (quoting Mozzetti v. City of Brisbane, 67 CalApp3d 565, 576 (CalCtApp 1977)) (emphasis in *Mozzetti*). Like South Dakota, California has a jury instruction explaining that a plaintiff is entitled to recover the "reasonable value" of medical services and another instruction, which provides that even when the care is rendered "gratuitously or paid for by a source independent of the wrongdoer," the plaintiff may still recover the reasonable value. Nonetheless, the California court determined that "reasonable value," is a term of limitation, which according to the court, meant the amount paid, rather than the amount billed. *Id.* at 643-44. Therefore, the court found that write offs were not recoverable.

[¶76.] In reaching this conclusion, the California court relied on the Restatement (Second) of Torts. It did not use section 920A, but instead, drew its support from section 911, entitled, "Value." It cited comment h in section 911, which explains what constitutes the "value of services rendered." *Hanif* emphasized a portion of the comment,

> When the plaintiff seeks to recover for expenditures made or liability incurred to third persons for services rendered, normally the amount recovered is the reasonable value of the services rather than the amount paid or charged. *If, however, the injured person paid less than the exchange rate, he can*

*recover no more than the amount paid*, except when the low rate was intended as a gift to him.

200 CalApp3d at 643 (quoting Restatement (Second) of Torts § 911 cmt h) (emphasis in *Hanif*). Because of this language and the court's view of the objective of a damage award, it expressly held that the "reasonable value" of medical services does not exceed the actual amount paid. *Id.* at 643-44.

[¶77.] Similarly, in *Moorhead*, the Pennsylvania Supreme Court relied on Restatement (Second) of Torts section 911 comment h and held that the amount accepted as full payment for the medical services was the amount the plaintiff could recover. 765 A2d at 789-90. The court believed that allowing the plaintiff to recover beyond what was actually paid "would provide her with a windfall and would violate tenets of just compensation." *Id.* at 790. The court did not find the collateral source rule or Restatement (Second) of Torts section 920A to be applicable. According to the court, the defendant was not attempting to "diminish" plaintiff's recovery, as plaintiff was fully entitled to recover the amounts paid by Medicare and Blue Cross. *Id.* Further, the court held that the collateral source rule was not implicated because no collateral source paid the "illusory 'charge.'" *Id.*; *see also* Smithers v. C&G Custom Module Hauling, 172 FSupp2d 765, 777-78; *Dyet*, 81 P3d at 1239-40; *Kastick*, 292 Ad2d at 798-99.

[¶78.] In South Dakota, it is well settled that plaintiffs are entitled to recover the reasonable value of their medical services, and what constitutes a reasonable value for those services is a jury question. We think it unwise for us to make a broad declaration that the reasonable value of medical services equals the amount paid, not the amount billed. *See Hanif*, 200 CalApp3d at 643-44. Such decision

would create an inference that the actual amount *billed* to patients by medical care providers is, as a matter of law, *unreasonable*. This Court equally cannot hold that a plaintiff is always entitled to recover the entire amount billed, rather than the amount paid. Such a ruling would declare that the amount billed, as a matter of law, constitutes the reasonable value for the provided services. Both results invade the province of the jury in its role of determining reasonable value.

[¶79.]    Nevertheless, when establishing the reasonable value of medical services, defendants in South Dakota are currently prohibited from introducing evidence that a plaintiff's award should be reduced because of a benefit received wholly independent of the defendants. *See Degen*, 90 SD at 410, 241 NW2d at 708; *Moore*, 89 SD at 434, 234 NW2d at 269. We have continued to apply the collateral source rule even though in some instances it may result in a windfall to an injured plaintiff. *Degen*, 90 SD at 410, 241 NW2d at 708; *Moore*, 89 SD at 434, 234 NW2d at 269. The intent of the rule has always been that it is better that a windfall go to an injured party than to a tortfeasor. *Moore*, 89 SD at 434, 234 NW2d at 269.

[¶80.]    Although the collateral source rule has a common law origin, and we have consistently applied the rule in a variety of tort cases, our Legislature has intervened to partially limit its scope with respect to medical malpractice "special" damages.[23] *See* SDCL 21-3-12. Neither side argues that this statute has any

---

23.    SDCL 21-3-12 makes admissible evidence of certain "special" damages paid for by insurance. In this case, however, although the plaintiff's complaint generally mentioned the term special damages, such damages were not specifically detailed or itemized as required by SDCL 15-6-9(g). Furthermore, the trial court did not instruct the jury on special damages, and the defendants did not raise SDCL 21-3-12 before the trial court as having a

(continued . . .)

applicability to this case. We think it prudent, therefore, as it applies to medical malpractice, to leave any further rule changes to the Legislature. Thus, in this case, the collateral source rule applies and defendants are precluded from entering into evidence the amounts "written off" by medical care providers because of contractual agreements with sources independent of defendants.

### 5.        Motion to Compel Production

[¶81.]        Defendants raise one last issue by notice of review. They argue that the court erred when it denied their motion to compel production of a report reviewed by plaintiff's expert. Plaintiff's expert, Dr. Holte, was given a report from a non-testifying expert for the plaintiff. According to defendants, Dr. Holte relied on this report in forming his opinion, and therefore, the report is discoverable under SDCL 15-6-26. The circuit court denied defendants' motion to compel production of the report. Because the court's decision pertains to an evidentiary issue, it is reviewed under the abuse of discretion standard. *See Steffen*, 2006 SD 41, ¶19, 713 NW2d at 620 (citing *Von Sternberg*, 2005 SD 14, ¶13, 692 NW2d at 554 (citing *Dokken*, 2000 SD 9, ¶39, 604 NW2d at 498))).

[¶82.]        Although a non-testifying expert's opinion is generally not discoverable, a report authored by that expert loses its "protective status" when a

_____

(. . . continued)

> bearing on any special damages. No instruction was proposed to the jury seeking to make these payments admissible because they constituted insurance payments on special damages. Moreover, in this appeal, the defendants in their notice of review do not allege that these medical bills constitute special damages. Indeed, they do not cite SDCL 21-3-12 as controlling in this case.

testifying expert relies on that report in forming an opinion. Kuper v. Lincoln-Union Elec. Co., 1996 SD 145, ¶28, 557 NW2d 748, 758. Defendants cite cases applying the companion federal rule and ask us to declare that on the sole basis that a testifying expert reviewed a report prepared by a non-testifying expert, the report loses its protective status and is discoverable. *See* United States v. City of Torrance, 163 FRD 590, 593-94 (CDCal 1995); Simon Property Group, LP v. mySimon, Inc., 194 FRD 644, 646 (SDInd 200); Heitmann v. Concrete Pipe Machinery, 98 FRD 740, 741-42 (EDMo 1983); County of Suffolk v. Long Island Lighting Co., 122 FRD 120, 123-24 (EDNY 1988); Gall v. Jamison, 44 P3d 233, 237, 239-40 (Colo 2002). All but one of defendants' cases, however, interpret and apply a federal rule not relevant to this case. The cases cited by defendants pertain to whether an expert's examination of attorney work product divests the attorney work product of its privileged status. *See Simon*, 194 FRD at 646; *Gall*, 44 P3d at 237. In this case, we are not examining whether attorney work product is privileged. We are interpreting SDCL 15-6-26(b)(4), which is similar to Federal Rule 24(b)(4). And, as one case cited by defendant noted, whether a non-testifying expert opinion is discoverable depends on the applicability of Rule 24(b)(4). *See Heitmann*, 98 FRD at 742-43.

[¶83.]     It is insufficient to declare that just because Dr. Holte reviewed the non-testifying expert's report, the report is discoverable. Rather, defendants must prove that Dr. Holte relied on the report in forming his opinion, or, under SDCL 15-6-26(b)(4)(B), that there are "exceptional circumstances" demonstrating that "it is impracticable for the party seeking discovery to obtain facts or opinions on the same

subject by other means." The circuit court held that Dr. Holte did not rely on the non-testifying expert's report in formulating his opinion. We see no reason to disagree with the court's conclusion. Considering that defendants do not allege that exceptional circumstances exist, the court did not abuse its discretion in denying defendants' motion to compel.

[¶84.]    Affirmed in part, reversed in part, and remanded.

[¶85.]    GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.