#24803-a-SABERS, Retired Justice

**2009 SD 71**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                                    Plaintiff and Appellee,

v.

TED ALVIN KLAUDT,                                         Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JAMES W. ANDERSON
Judge

* * * *

LAWRENCE E. LONG
Attorney General

PATRICIA J. DeVANEY
GARY CAMPBELL
Assistant Attorneys General
Pierre, South Dakota                          Attorneys for plaintiff
                                              and appellee.

TIMOTHY J. RENSCH of
Rensch Law Office, Prof. LC
Rapid City, South Dakota                      Attorneys for defendant
                                              and appellant.

* * * *

ARGUED MARCH 23, 2009

OPINION FILED **08/05/09**

#24803

SABERS, Retired Justice.

[¶1.]     Ted Klaudt appeals the guilty verdicts returned on four counts of second degree rape. He contends that the trial court abused its discretion by refusing three of his requested jury instructions, and that there was insufficient evidence to convict him of three of the four second degree rape charges. We affirm.

## FACTS

[¶2.]     Klaudt, a former state legislator, and his wife, Connie, provided foster care for children placed within their home by the State of South Dakota. The Klaudts resided on a farm near Walker, South Dakota.

[¶3.]     Due to abuse, A.M. was removed from her biological parents' home several times, beginning when she was in kindergarten. As a young teenager, A.M. became defiant and ultimately found herself committed to the South Dakota Department of Corrections (DOC). After a series of placements, A.M. was placed with the Klaudts in April of 2003, at the age of 15.

[¶4.]     Over time, A.M. and Klaudt grew close as she began to trust and confide in him. A.M. spent more time with Klaudt than anyone else living in the home. Klaudt told A.M. that because he thought of her as a daughter, she need not associate with the other girls as she was "better than them." She testified that Klaudt would become upset if she befriended any of them, so she tended to isolate herself from everyone but Klaudt. A.M. also testified that she and Klaudt discussed sexual topics in obscene terms, and that on several occasions, Klaudt asked her to sit on his lap and cuddle with him as he did with the other foster girls. Due to the abuse she encountered from her biological father, A.M. repeatedly refused the

-1-

offers. However, A.M. permitted Klaudt to take nude photos of her during the summer of 2003, after he told her that one of his contacts could get modeling work for her, and that the photos were necessary to determine what types of clothes would fit her. The photos were not discovered during the investigation.

[¶5.] In late 2004, A.M. commented to Klaudt that she never wanted to have children and that she may as well have her uterus removed. Upon hearing this, Klaudt developed an "egg donation" scheme, complete with a lengthy egg donor application, to allow Klaudt to perform certain examinations and measurements, supposedly to determine if A.M. qualified to be an egg donor. To heighten her interest, Klaudt told A.M. of the potential to make up to $10,000 per buyer by selling her eggs to infertile women. Klaudt assured A.M. that if she donated her eggs, she would never have to worry about getting loans to purchase a car, pursue a college degree, or for anything she ever wanted.

[¶6.] Under the belief that this scheme was real, A.M. allowed Klaudt to perform "exams" on eight to ten occasions, all at times when A.M. was 17 or 18 years old. Three of the occasions are the subject of this case, as they occurred in Klaudt's hotel room at a hotel in Pierre, while Klaudt was serving as a state legislator. At the hotel, Klaudt produced a briefcase with speculums, a tape measure, latex gloves, a caliper, antibacterial gel, tubing, syringes, a vibrator, KY-brand lubricant, and a notepad. First, Klaudt would conduct a breast exam. He would measure A.M.'s nipples under her shirt after she removed her bra, and then he would feel the glands in her breasts to determine, as he claimed, how close she was to ovulation. He would record this information in his notepad. Klaudt would

then inform A.M. that he was going to wait outside the room until she had undressed from the waist down and covered her body with a bed sheet. Klaudt would then reenter the room. He would first conduct an ovary check, for which he would insert his latex-gloved fingers into her vagina and press down on her stomach with his other hand. After that, Klaudt would use the vibrator and his fingers to perform what he called vaginal stimulation. Thereafter, he would insert a speculum to open up her vagina, insert a fluid into her vagina with the syringe, and then withdraw the fluid, supposedly completing the examination. A.M. testified that because she was so uncomfortable with Klaudt performing these exams, she cried during every one of them and that if her legs closed during the course of the exam, Klaudt would reopen them to finish the exam.[1] She also testified that although she allowed the exams to be performed because she thought she would be monetarily rewarded, she never would have agreed had she known it was a sham.

[¶7.]     In conjunction with these procedures, A.M. received numerous emails, either forwarded by Klaudt or directly from an individual named "Terri Linee," who supposedly was an agent of an egg donation agency. The emails, which began in the latter part of 2004, strongly and repeatedly encouraged A.M. to complete the required exams, told her to relax and not cry during the exams, reinforced the monetary benefits that would be reaped upon successful completion of the exams, and maintained the good reputation Klaudt had with the "agency." These emails,

---

1. A.M. testified, however, that her legs would close during the exam because her muscles would become tired, not because she did not want Klaudt to complete the exam.

which echoed many of the conversations A.M. had with Klaudt, were in fact written by Klaudt, and there was no such person as Terri Linee. At one point as an incentive to complete the exams, Klaudt, under the guise of Linee, sent A.M. a payment of $250 as an advance.[2] When A.M. failed to submit to the exams as frequently as Klaudt desired, Klaudt used the Linee email account to threaten A.M. that she would have to repay the $250 if she did not finish the exams, and failure to repay the money would negatively affect her credit rating.

[¶8.] In the fall of 2006, A.M. left the Klaudt home to attend college in Bismarck, North Dakota. After she left, Klaudt often called, left voice messages, or texted A.M. to see what she was doing. Klaudt also created other email accounts and used them to stay in contact with A.M. without her knowing it was Klaudt, and further used the email accounts to contact other people in Bismarck to spy on A.M. and say things to A.M. in an effort to cause turmoil in her romantic relationships.

[¶9.] In January 2007, A.M. was having a financial dispute with Klaudt over work she was to perform on the farm and payments she had failed to make for a car loan and car insurance. Klaudt's contact with A.M. had become so incessant that she eventually changed her phone number. When she called to inform her biological mother of her new phone number, A.M. revealed the egg donation scheme and accompanying exams. The South Dakota Division of Criminal Investigation was contacted and an investigation ensued. The investigation revealed a previous

---

2.  The advance was initially $500, but Klaudt told A.M. that $250 was for exam supplies.

report about an egg donation scheme involving Klaudt and another of his foster daughters, J.S.

[¶10.]    J.S. arrived at the Klaudt home in 2002, at the age of 15. Like A.M., J.S. went through several foster homes and programs with the DOC before being placed in the Klaudt home. Although J.S. did not become very close to Klaudt, she developed a close relationship with Klaudt's wife, Connie. In March of 2006, J.S. told her friend's mother that Klaudt performed a test on her where he put something inside her vagina to draw out fluid to see if she was fertile enough to donate her eggs. After informing Klaudt of this report and hearing how this would hurt Klaudt, the family, and especially Connie, J.S. recanted the story and the investigation was eventually dropped.

[¶11.]    After A.M.'s claims were made in early 2007, and after A.M. spoke with J.S., J.S. admitted that her previous report was true. J.S. testified that after she had found an egg donor application under the bed of another foster daughter, she asked Klaudt about it. Klaudt told J.S. that she could make $5,000 per egg, if she proved fertile. J.S. had expressed concern to Klaudt of being infertile because she suffered from pelvic inflammatory disease. In response, Klaudt offered to perform the procedures. J.S. was 19 years old when Klaudt performed the exam on her at the same hotel in Pierre. The routine was essentially the same as what was done to A.M., except that Klaudt had J.S. insert the speculum and vibrator into her vagina herself. J.S. testified that when she could not insert the vibrator, Klaudt started forcibly pushing it, causing J.S. to cry because of the pain, and he would not stop when she asked.

[¶12.]    Klaudt was charged in Hughes County with four counts of second degree rape through the use of force or coercion.[3]  The first three counts stemmed from A.M.'s allegations, and the last count related to J.S.'s allegation.  At the trial, three girls, in addition to A.M. and J.S., testified to Klaudt performing or attempting to perform the same exams upon them.  They testified that Klaudt used the same method of persuasion to allow him to perform these exams so they could possibly qualify for egg donation and earn money.  At the close of the State's case, the defense moved for a judgment of acquittal as it related to the three counts involving A.M.  The motion was denied.  Furthermore, during the settling of instructions, the trial court refused certain instructions requested by the defense.  Ultimately, the jury convicted Klaudt on all four counts.  He was sentenced to four consecutive, eleven-year terms in the penitentiary.[4]  Klaudt appeals, raising two issues:

> 1.    Whether Klaudt was deprived of due process and a meaningful opportunity to present a complete defense, when the trial court refused to give the proffered theory of defense instructions, and when, individually and/or together, those instructions were a correct statement of the law and were supported by the facts of the case.
>
> 2.    Whether a judgment of acquittal as to counts I, II, and III should have been granted, and whether there is sufficient

---

3.    Klaudt was not charged with second degree rape through the use of threats.

4.    Klaudt was charged in Corson County with two counts of witness tampering, four counts of second degree rape, two counts of sexual exploitation of a minor, one count of stalking, and one count of sexual contact with a child under 16.  All charges, except the two counts of witness tampering, were dismissed by the prosecutor.  Klaudt pleaded guilty to the two counts of witness tampering and was sentenced to ten years for each count, to run consecutively.

evidence to sustain the ensuing convictions, when the alleged victim admitted under oath that she agreed, allowed, wanted, and consented to the penetration, and when she admitted Klaudt did nothing to deprive her of her free will.

## STANDARD OF REVIEW

[¶13.]     The standard of review for a trial court's instructions to the jury is well settled. "'A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard.'" State v. Cottier, 2008 SD 79, ¶7, 755 NW2d 120, 125 (quoting State v. Packed, 2007 SD 75, ¶17, 736 NW2d 851, 856). However, "'[a]n accused must be afforded a meaningful opportunity to present a complete defense.'" State v. Reay, 2009 SD 10, ¶34, 762 NW2d 356, 366 (quoting Packed, 2007 SD 75, ¶27, 736 NW2d at 860). "'When a defendant's theory "is supported by law and . . . has some foundation in the evidence, however[ ] tenuous[,]" the defendant has a right to present it.'" Id. (quoting Packed, 2007 SD 75, ¶25, 736 NW2d at 859). Nonetheless, "'[j]ury instructions are to be considered as a whole, and if the instructions when so read correctly state the law and inform the jury, they are sufficient.'" State v. Huber, 356 NW2d 468, 471 (SD 1984) (quoting State v. Fox, 313 NW2d 38, 41 (SD 1981)). This is a question of law reviewed de novo. Cottier, 2008 SD 79, ¶7, 755 NW2d at 125 (citing Papke v. Harbert, 2007 SD 87, ¶13, 738 NW2d 510, 515).

[¶14.]     We review a trial court's consideration of a motion for directed verdict under the following standard:

> The denial of a motion for judgment of acquittal presents a question of law, and thus our review is de novo. We must decide anew whether the evidence was sufficient to sustain a

conviction. In measuring evidentiary sufficiency, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

State v. Tofani, 2006 SD 63, ¶24, 719 NW2d 391, 398 (quoting State v. Disanto, 2004 SD 112, ¶14, 688 NW2d 201, 206) (internal citations omitted).

[¶15.]	**1.	Whether Klaudt was deprived of due process and a meaningful opportunity to present a complete defense, when the trial court refused to give the proffered theory of defense instructions, and when, individually and/or together, those instructions were a correct statement of the law and were supported by the facts of the case.**

[¶16.]	Klaudt argues that the trial court deprived him of due process and a meaningful opportunity to be heard by failing to give three jury instructions he claims correctly embodied the law of this state and were supported by the facts presented at trial. Klaudt conceded at oral argument that he was not precluded from arguing to the jury the principles embodied in his requested instructions. Nonetheless, Klaudt maintains he was prejudiced because he had to argue his position without accurate and complete theory of defense instructions that the jury was sworn to follow. The State contends that the instructions were sufficient as given, and Klaudt's proposals were either redundant or misleading.

[¶17.]	The State's theory was that Klaudt, under the guise of Terri Linee and as Klaudt's roles as a foster parent and state legislator, committed second degree rape when he forced and coerced the victims to give consent to perform the exams. The State argues any consent given was ineffective due to the force and coercion, and because the egg donation scheme was phony; thus, there was no consent for Klaudt to penetrate the victims for his own sexual gratification. In contrast, the

defense maintains that while Klaudt's actions were disgusting, immoral, and based upon lies, his actions constituted something other than rape because under South Dakota law it is not criminal to utilize deception to obtain another's consent for penetration. Furthermore, Klaudt insists that his actions did not constitute rape because the victims consented to the exams in the manner they were performed, the victims were able to legally consent to the penetration, and it is not a crime in South Dakota for a foster father to penetrate a foster child, under the circumstances presented in this case.

[¶18.] Error in refusing a proposed instruction "'is reversible only if it is prejudicial, and the defendant has the burden of proving any prejudice.'" State v. Martin, 2004 SD 82, ¶21, 683 NW2d 399, 406 (quoting State v. Webster, 2001 SD 141, ¶7, 637 NW2d 392, 394). "'This requires a showing that the alleged error, in all probability, produced some effect upon the jury's verdict and was harmful to the substantial rights of the party assigning it.'" Id. ¶37 (quoting State v. Fast Horse, 490 NW2d 496, 500 (SD 1992)).

### Defendant's Requested Instruction No. 6

[¶19.] The first instruction requested by the defense provided:

> The heart of a forcible rape charge is lack of consent. Therefore, if the alleged victim consented to the charged sexual penetration, the Defendant cannot be convicted of the charge of Second-Degree Rape.

The court refused this specific instruction, but gave Instruction 10A, which provided:

> If the alleged victim consented to the charged sexual penetration, the Defendant cannot be convicted of the charge of Second-Degree Rape.

The language of the two instructions is the same, with the exception that the first sentence of the defendant's requested instruction is excluded. Klaudt argues that the first sentence is necessary, is valid law in South Dakota, and failure to include it in the instruction constitutes error of a constitutional magnitude because he was deprived of the opportunity to explain that consent is the gravamen of rape.

[¶20.]    From our reading of the requested instruction, we hold that the two sentences, in essence, say the same thing. The second sentence clarifies and explains the first sentence, and is a clearer statement of the law. We do not agree that both statements are necessary. The defense correctly acknowledges in its brief that there is no error committed if the trial court refuses to amplify instructions which substantially cover the principle embodied in the requested instruction. State v. Jensen, 2007 SD 76, ¶19, 737 NW2d 285, 291; State v. Eagle Star, 1996 SD 143, ¶13, 558 NW2d 70, 73; State v. Gillespie, 445 NW2d 661, 664 (SD 1989); State v. Weisenstein, 367 NW2d 201, 206 (SD 1985). We hold that the principle embodied in the first sentence was substantially covered, even if implicitly, in the second sentence, which was given in its entirety in Instruction 10A.

[¶21.]    Klaudt cites *State v. Charles*, 2001 SD 67, ¶19, 628 NW2d 734, 738, and *State v. Frey*, 440 NW2d 721, 727 (SD 1989), as support for the proposition that a defendant is entitled to an instruction on his theory of the case when evidence supports the same. Although this is true, these cases do not entitle a defendant to an instruction *as explicitly proposed by the defendant*. Klaudt's theory of the case, as it relates to Defendant's Requested Instruction No. 6, was that because the victims gave consent for the exams, there was no rape. When considering the

#24803

instructions as a whole, the theory of consent in this regard was sufficiently covered.  Therefore, the court did not abuse its discretion by refusing to give Defendant's Requested Instruction No. 6.

***Defendant's Requested Instruction No. 8***

[¶22.]      Klaudt next contends that the trial court abused its discretion by not giving his requested instruction number 8, which provided:

> A girl sixteen years of age or older can legally consent to penetration, sexual or otherwise, of her vaginal opening.
>
> It is Mr. Klaudt's defense to the rape charges that [A.M.] and [J.S.] consented to penetration.  The State must, therefore, prove beyond a reasonable doubt that [A.M.] and [J.S.] did not consent at the time they were penetrated by Mr. Klaudt.  If the State cannot prove a lack of consent beyond a reasonable doubt it is your duty to acquit Mr. Klaudt of the charge or charges for which consent cannot be disproved.

Klaudt argues that his requested instruction number 8 embodies principles of law not included in the given instructions.

[¶23.]      Three instructions given to the jury specifically involved the elements of second degree rape and the concept of consent.  Instruction No. 5 provided:

> Any person who accomplishes an act of sexual penetration with any person through the use of force or coercion is guilty of a crime.
>
> The elements of the crime of rape in the second degree, each of which the State must prove beyond a reasonable doubt, are that at the time and place alleged:
>
> 1. The Defendant accomplished [an] act or acts of sexual penetration with A.M. and J.S.; and
> 2. The Defendant accomplished such act or acts of sexual penetration through the use of force or coercion.

The jury was also given Instruction No. 10, which provided:

-11-

> Females 16 years of age or older may legally consent to sexual activity including sexual penetration. However, if you find beyond a reasonable doubt that there was sexual penetration and that the sexual penetration was accomplished by force or coercion, the concept of consent does not apply.

Furthermore, we reiterate that Instruction No. 10A provided:

> If the alleged victim consented to the charged sexual penetration, the Defendant cannot be convicted of the charge of Second-Degree Rape.

Klaudt contends it was error for the jury not to be explicitly instructed that the State had to prove lack of consent *beyond a reasonable doubt*, and that the State's failure to meet that burden required the jury to acquit Klaudt.

[¶24.] In response, the State maintains that the last two sentences of Defendant's Requested Instruction No. 8 are incorrect statements of the law. The State argues, "Consent is not an element of second-degree rape to be disproved by the State. It is a defense to be raised which may negate the elements of force, coercion or threat." Although lack of consent is not an explicit element of second-degree rape, it is a crucial component to the rape statute *if* consent is raised as a defense. Under our statute, proof of force or coercion beyond a reasonable doubt vitiates otherwise effective consent.

[¶25.] In *State v. Jones*, this Court affirmed an instruction stating in part, "The allegation . . . of the use of force, or coercion or threats of immediate and great bodily harm against the victim requires the state to prove beyond a reasonable doubt that the alleged victim did not freely and voluntarily consent to the act of sexual penetration." 521 NW2d 662, 671-72 (SD 1994). The issue on appeal, however, dealt with a subsequent portion of the instruction regarding the

interrelationship of consent with resistance and submission. *Id.* at 672. Therefore, the language Klaudt uses to support his argument was not specifically at issue in *Jones*. As such, Klaudt fails to identify any authority deeming the failure to explicitly instruct on this alleged standard an abuse of discretion requiring reversal.

[¶26.]     Instruction No. 10 instructed that if force or coercion was proven beyond a reasonable doubt, the concept of consent does not apply. Because force or coercion *and* consent cannot co-exist, it is implicit that if force or coercion is proven beyond a reasonable doubt, lack of consent is, by necessity, also proven beyond a reasonable doubt. Reading Instruction No. 10A in conjunction with Instruction Nos. 5 and 10, we conclude the jury instructions were sufficient as to this issue. Therefore, the trial court did not abuse its discretion by denying Defendant's Requested Instruction No. 8.

### *Defendant's Requested Instruction No. 9*

[¶27.]     Klaudt's last allegation of error relating to instructions is with the court's refusal to give his requested instruction number 9, which provided:

> It is not unlawful for a foster father to engage in sexual penetration with a foster daughter, so long as there is no common blood between the two, and the foster daughter is at least sixteen years of age, and both consent.

> It is not unlawful to use deception to obtain another's consent to sexual penetration.

The State maintains that this requested instruction was properly rejected because the first sentence introduced an extraneous and irrelevant matter, namely incest, into the case. Moreover, the State submits that the last sentence of the instruction

is substantively incorrect because fraud and deception can negate consent in rape cases.

[¶28.] We acknowledge that, on its face, the first portion of the instruction is substantively correct pursuant to South Dakota law. *See* SDCL 22-22A-2; SDCL 22-1-8. However, under the facts of this case, it was impossible for Klaudt to commit incest with A.M. or J.S., simply due to lack of the requisite degree of consanguinity between Klaudt and his victims. The record reveals that Klaudt was never charged with incest, the State never attempted to prove incest, and the crime of incest was never mentioned to the jury. This sentence, although substantively correct, injects an extraneous matter into the jury box.

[¶29.] Klaudt contends, however, that the analysis is more complex based on the instruction defining "coercion." Instruction No. 7 provided in part:

> "Coercion" as used in this case exists where one is, *by the unlawful conduct of another*, induced to do or perform some act under circumstances which deprive her of the exercise of her free will[.]

(Emphasis added.) He argues that because the instruction requires the coercion be executed through unlawful conduct, then the jury should have been instructed that the penetration at issue in this case was not unlawful incest. This argument lacks merit. Even though a lay person may think a foster father's sexual penetration of his foster daughter is incestuous, it does not follow that "[a person] is, *by the [crime of incest]*, induced to do or perform some act . . . ." Moreover, Klaudt fails to identify any authority that constitutionally requires an instruction on what is *not* unlawful, illegal, or criminal. Therefore, for these reasons and because this sentence would have added an extraneous legal matter to the case and may have created confusion

-14-

for the jury, the trial court did not abuse its discretion by refusing this initial portion of the instruction.

[¶30.] We come to the same conclusion as to the latter portion of the instruction, which provided, "It is not *unlawful* to use deception to obtain another's consent to sexual penetration." (Emphasis added.) Klaudt failed to identify any authority providing that due process requires instructing the jury on what conduct "is *not* unlawful." Additionally, the requested jury instruction is, in effect, argument that seeks to amplify the court's instructions on what is prohibited criminal conduct. Therefore, this type of instruction is not required. *See Eagle Star*, 1996 SD 143, ¶13, 558 NW2d at 73 (citations omitted) (stating, "[i]t is not error for the trial court to refuse a requested instruction which amplifies the principle embodied in a given instruction").

[¶31.] In conclusion, the instructions given to the jury correctly and adequately explained the law as it related to the underlying conduct at issue in this case. Furthermore, Klaudt conceded on appeal that he, in fact, argued to the jury the principles embodied in his requested instructions. Therefore, we affirm the trial court because Klaudt has failed to demonstrate prejudicial error.

[¶32.] **2. Whether a judgment of acquittal as to counts I, II, and III should have been granted, and whether there is sufficient evidence to sustain the ensuing convictions, when the alleged victim admitted under oath that she agreed, allowed, wanted, and consented to the penetration, and when she admitted Klaudt did nothing to deprive her of her free will.**

[¶33.] Klaudt maintains he should have been acquitted of the three counts of second degree rape alleged by A.M. as there was no allegation of force and the

evidence was insufficient to support coercion, as defined by the jury instructions.[5] He argues that A.M. clearly consented to the penetration, even though she was deceived as to the purpose of the penetration. The State alleges Klaudt committed second degree rape through the use of force and coercion.

[¶34.] Under South Dakota statute, rape in the second degree is defined as "an act of sexual penetration accomplished with any person . . . [t]hrough the use of force, coercion, or threats of immediate and great bodily harm against the victim or other persons within the victim's presence, accompanied by apparent power of execution[.]" SDCL 22-22-1(2). Unlike several states, South Dakota has not criminalized the use of deception or fraud, or acts constituting the same, to obtain consent to sexual penetration.[6] Therefore, we must determine if the evidence was sufficient to prove beyond a reasonable doubt that Klaudt used force or coercion to obtain A.M.'s consent to penetration.

---

5.   Klaudt does not appeal the sufficiency of evidence pertaining to the second degree rape charge involving J.S. J.S. testified that Klaudt used force to insert the vibrator, and continued to insert it after she told him to stop. *See* ¶11, *supra.*

6.   *See* AlaskaStat 11.41.420(a)(3)(C); ArizRevStatAnn 13-1401(5)(c); CalPenalCode 261(a)(4)(C)–(D); ColoRevStatAnn 18-3-402(1)(g); ConnGenStatAnn 53a-71(a)(7); HawRevStatAnn 702-235(4); 720 IllCompStatAnn 5/12-13(a)(2); KanStatAnn 21-3502(a)(3); MichCompLawsAnn 750.520b(1)(f)(iv)-(v); MinnStatAnn 609.345(1)(k); MoAnnStat 556.061(5)(c); MontCodeAnn 45-5-501(1)(ii)(C); NebRevStatAnn 28-318(8)(a)(iv); NevRevStatAnn 200.366(1); NDCentCode 12.1-20-03(1)(c) (amended 2009); OhioRevCodeAnn 2907.02(A)(1)(a), 2907.03(A); OklaStatAnn tit 21, 1111(A)(5); RIGenLaws 11-37-2(4), 11-37-4(3); TennCodeAnn 39-13-503(a)(4), 39-13-505(a)(4); UtahCodeAnn 76-5-406(12).

[¶35.]        "Force" and "coercion" were defined in Instruction No. 7, as follows:

> "Coercion" as used in this case exists where one is, by the unlawful conduct of another, induced to do or perform some act under circumstances which deprive her of the exercise of her free will: it may be either actual, where physical force is put on a woman to compel her to do an act against her will, or implied, where the relationship of the parties is such that one is under subjection to the other.
>
> As used in these instructions, the terms "force" and "coercion" are synonymous.[7]
>
> The terms mean to make a person follow a prescribed or dictated course.
>
> To coerce is to force one to act in a given manner by pressure, threats or intimidation.
>
> To force is to compel through pressure or necessity or to inflict or impose one's will on someone else.

By this instruction, neither force nor coercion was limited to physical means; both could be effected through psychological means. Here, the underlying facts demonstrate that the coercion was effected through psychological means.

[¶36.]        Viewing the totality of the circumstances, the evidence of psychological efforts to coerce A.M. was overwhelming. A.M. was a ward of the state, a young, vulnerable girl with a troubled history, who was placed in Klaudt's home under his authority. A.M. testified that after arriving at the home, Klaudt warned her that if she did not "straighten up," she would be sent back to DOC and locked up out-of-state until she was 21. Due to her history, A.M. distrusted people in general. Over time, however, Klaudt gained A.M.'s trust and respect. A.M. looked up to Klaudt as both a foster father and a state legislator. Moreover, in an effort to isolate A.M. from the other foster daughters, Klaudt told A.M. that she need not be friends with

---

7.    Although not significant to any issue in this case, we do not agree that the terms "force" and "coercion" are synonymous.

the others because she was better than them. If Klaudt saw A.M. speak to the other girls, he became upset. It bothered A.M. when Klaudt was upset or mad at her. For example, in the middle of one exam, A.M. commented to Klaudt, "I think you like doing this." A.M. testified that in response, Klaudt became upset, stormed out of the room, and was mean to A.M. when she followed after him. After A.M. told Klaudt that she did not mean what she said, Klaudt "finished [the exam] and he was fine then." Klaudt used his emotions and A.M.'s weaknesses to manipulate her, which ultimately added to the psychologically coercive atmosphere.

[¶37.] Klaudt used the incentive of money to obtain A.M.'s consent. Klaudt knew A.M. wanted to buy a new car and attend college, so when the opportunity arose for him to present his phony egg donation scheme, he enticed A.M. with all the money she could earn if she proved to be eligible to donate her eggs. The coercion was evidenced by Klaudt increasing the monetary incentive as time passed; just before Klaudt's ploy was spoiled, A.M. was being told she could make up to $30,000 for being a donor. As explained below, the monetary coercion also pervaded the emails Klaudt sent to A.M.

[¶38.] The psychological coercion was most clearly evidenced by the continual emails from Terri Linee, beginning in the latter part of 2004.[8] Near the end of 2005, Klaudt forwarded A.M. an email allegedly received from Linee:

> Hello[,] Ted[.] I need to know if you're going to get your client tested. If [it's] the money, my client will pay more. We really do need to know soon. The testing needs to be done this month. Thanks[,] Terri[.]

---

8. During a motions hearing, the State represented that there were over 7,000 pages of email messages and internet chat conversations relating to this case.

The message continued with a response from Klaudt supposedly to Linee:

> Hello[,] [T]erri[.]  [M]y client said if they are willing to pay $10000[,] she will do the testing this month.  Do [you] think the 3[-]time uterus flush is the best way to go[?]  Thanks[,] [T]ed.

In response, Linee replied:

> Ted[,] glad to hear that she is going to go forward.  I just talked with my client[s] and they are willing to pay her the $10000 if she scores over a 26.[9]  They even said they will give her $1000 for each point she scores over a 26.  They also said if she needs money now, they will send her $500 up[-]front money now[.] [W]e can send it to you.  I really do think the flush is the only way you can go with her.  She really need[s] to relax and get the testing done.  [I am] sure she will make a 26 [at least].  She has such a high estrogen level it would be hard for her not to score the 26 or above.  Please let me know if she wants the up[-]front money[.]  [A]nd where is her cycle at now?  Please let me know [ASAP].  I can arrange the up[-]front money as soon as [I] get [confirmation] from you she is going to do it and if she wants it now.  Thanks[,] Terri[.]

The reference to A.M. needing to relax, which was a common theme in the emails, was in response to A.M. crying when the exams were being performed and Klaudt would tell her "to relax" and "be professional."

[¶39.]     Klaudt responded:

> Terri[,] my client would like the up[-]front money now.  She is very committed to start the testing when [you] say [it's] time for the first test.  Her period started on the 16[th] of [N]ovember.  I really think she is ready to move forward with this.  I am sure she will make a good donor.  Please let us know when to do the first one.  I'll need to call [and] visit with [you] more before to make sure [I] do it right.  Please let us know when we need to do the first one.  How many do [you] think we will need to do?  [T]hanks[,] [T]ed[.]

---

9.      Klaudt told A.M. this number was in reference to her estrogen level.

To cement A.M.'s belief in this whole scheme, Klaudt gave A.M. $250 from one of his accounts, claiming it was from Linee and that the remaining $250 was for testing supplies. A.M. testified that the money was to motivate her to get the tests finished.

[¶40.]     The emails continued:

> Hello, Ted[.] [I am] glad to hear we are moving forward. If she started her period on the 16th of [N]ovember[,] she will need to do the first testing [within] the next 3 days. Please encourage her to have it done. If not[,] it will set the whole process back another month. You have done these tests on your last client and the test results were very good. How is she doing since she did the last donation[?] She really lucked out with [ ] her couple. I [can't] believe they paid her $14000 and all her expenses. Well[,] as for how many[,] it will depend on how well she cooperates with you. If she does it the right way[,] she will maybe get by with 2 or 3. If she [won't] let you do it right[,] then it might take 3-5 times. The # of times it is needed to be done all depends on how much [fluid] you can get out of her each time. [I am] not worried about the quality as [I am] very sure it will score very high. I how [sic] you can have her read these messages, as it will help her[,] [I am] sure. I will have the $500 sent to you as soon as we get the first sample from you. The money you know is hers to keep no matter what[,] as long as she allows you to [submit] all the test[s] we need from her. [I am] confident she will have them done on time and hopefully[,] 2 time[s]. You really do need to get this done as soon as you can but [within] the next 3 days. Thanks[,] Terri[.]
>
> P.S. [K]eep up the good work[,] Ted[.] [I]s your [address] still 102050 Walker Rd[.], Walker[,] South Dakota 57659[?] Please let me know and I will be looking for it on [T]uesday of next week.

[¶41.]     Then, Linee started sending the emails directly to A.M:

> Hello [A.M.,]
> I just wanted to remind you that your next test has to be done around the middle of your cycle. The last email [I] received from Ted was you had [ ] started your period on the 14[th] of [December]. That would mean that your next test would need to [be] done around the 28[th] of [December]. I am assuming [you]

are home for [C]hristmas break.  If this is the case [and] you are not able to get together with Ted for the test that will be ok.  If you miss this testing time[,] then the next ideal time would be around 2-4 days before your next period.  Then 2-4 days after [you] get over your period.  I have been emailing Ted and he has not emailed back.  Have you talked to him in the last week[?]  He did tell me he was going to be very busy [these] next couple of weeks.  If you talk to him[,] please have him email me back so [I] know where the testing is at.  [I am] hoping he got you the testing fee that my client paid him[.]  [I]f not[,] bug him until he gets it to you.  I have very high hope[s] for you as a donor.  Your estrogen testing was so high[.]  [T]hat tells me you have one indicator of [ ] high fertility.  Now we just need to see how healthy your eggs will be.  This is the reason for these tests.  Please get [a hold] of Ted and set up a time to complete these test[s].

[A.M.,] it would help if you could relax more[.]  [I] know it [is] hard but please try harder to relax for the testing.  I did talk with Ted just after the last test and he is getting [kind of] burned out with the problems he has had with your testing.  He does it as best as he know[s] how [and] he is good at it.  Please [don't] upset him to the point of where he [won't] finish the testing for us.  I have worked with Ted for about 3 years now and [I] have found out you can push him only so far and he will just stop[.]  [S]o please take it easy [and] work with him[,] not against him.
Thanks [and] have a great [New Year].
Terri.

When A.M. failed to respond, the emails became increasingly strident and pressing,

instructing A.M. to go to Klaudt to get the testing completed.

[A.M.,] [I] really do need to know what your testing schedule is looking like.  I [don't] want to sound over[-]bearing[,] but we did send you $250 up[-]front money to assist you with expenses to complete the testing.  I would [at least] ask you [to] please respond to my emails.  I have a tight schedule to work around and need to know when you are going to get it done.  Please talk with Ted about it [and] let me know.  I do understand you [probably] went home for Christmas and so you could not do the testing on the 27th of [December,] so please let me know.
Thank [y]ou[,] Terri[.]

The following week, A.M. received another email:

#24803

> Hello [A.M.,] I hope you had or are having a good Christmas break. I just want to make sure we are still on track. If my charting of your periods [is] correct[, ] you should be getting your next period [ ] around the 12[th] of January. If this is correct[,] then you will need to get [a hold] of Ted and see if he [can] do another test on you somewhere between the 8[th]-10[th] of January. I have also cc: a copy of this to him. [I am] hoping you are back from break or [at least] can get [a hold] of him to do these very needed tests. Then you will need one more about 3-8 day[s] after you get over your period. The closer to the 8 days would be best. I [can't] express how important these test[s] are needed. [I am] comfortable with you completing them in the time frame they are needed. That is the reason I had the up[-]front money sent to you. Normally we [don't] send it out until the testing is completed. I have great expectations that you will be a very great donor. Well[,] [I] do need to get going[,] but please email me back [and] confirm these dates for me. Thanks[,] Terri[.]

When A.M. did not respond, she received the following emails two and four

days later:

> Hello [A.M.,] I am getting a little concerned that [you aren't] answering my email. I had an email from Ted [and] he said he would be [available] for the next 2 weeks to do these needed tests. He also told me he would not contact you. He said if you want these done[,] then it [is] your move to contact him. He said you have his phone #[,] so please call him and get it lined up. You really do need to talk to him and also PLEASE EMAIL ME BACK. I really do need to know [what's] going on. Thank [y]ou[,] Terri[.]

> [A.M.,] why [aren't] you returning my emails[?] I am getting very concerned. [I am] hoping that [you] will take this [seriously] because we sent you money and expect you to complete these test[s] when we need them. I am c.c. this to Ted hoping he will find out for us what you are planning on doing[.] I do need to know now what your intentions are. PLEASE EMAIL ME BACK SOON.

These emails were received just prior to the start of the 2006 legislative session, at

which A.M. served as a page. After being bombarded with these emails, A.M.

allowed Klaudt to perform the exam at his hotel in Pierre.

-22-

[¶42.] A few months after the legislative session, the emails continued. An email from Linee informed A.M. of another couple that wanted to use her eggs and was willing to pay $10,000. The message also indicated there were new, easier tests available that Klaudt could perform on her. In one email Linee pleaded, "Please [A.M.] let me know as this would be a big break for you."

[¶43.] Another email received near the end of June 2006 informed A.M. that yet another couple wanted her eggs and indicated that the collection for both buyers could be done at the same time, earning A.M. $20,000. Within sixteen hours, A.M. received another email, this one containing overt threats:

> [A.M.,] I really do need to know if you are interested in doing egg donation. I [don't] know if you know what [I] have been asking of you. I hope you are getting these messages[.] [I] know you said you [don't] check your email often[,] but [I] need to know. I am offering you the once[-]in[-]a[-]life[time] chance with two couple[s] very interested in using you as a donor. This would mean you can make around $20000 for the donation. I am sure you can produce plenty of eggs at one collection for both couples. Please, even if you are unsure at this time[,] just let me know that. *I must hear from you very soon[.] [I]f I don't[,] I will be forced to withdraw all of [ ] your information and put a restricter out on you. I do need to remind you that if you [don't] [at least] try[,] [I] will be forced to take action to collect the $250 we paid you in good faith money that you have never completed. This will affect your credit and even affect you when you apply for a student loan.* I hope you understand how important it is that you respond to these emails. Thank[] you[,] Terri[.]

(Emphasis added.)

[¶44.] Three days later, A.M. received another email reminding her that two couples wanted her eggs and that she stood to make $20,000, and that if she failed to comply, action would be taken to collect the $250. The email provided in part, "[I] see you are opening my email[.] [I] have auto recipient so I know when you open

them. . . . I [can't] understand how you can pass up this kind of offer. I mean $20000 is [a lot] . . . . I do need to hear from you or [I] will be forced to [proceed in] other areas[.] The one is collecting the money we paid you up front." A.M. responded to this email, and the following email from Linee was more positive, telling her to work with Klaudt, who was willing to help her, but was disappointed with the way things were going. Linee also noted, "[Ted] will gladly [perform the exam,] but he wants you to be the [one] to ask him for the help. I know if you will do as Ted tells you that you will be $20000 richer." Then the email ended, "Please[,] [let's] get going now[.] [I] need to know what day you last had your period and then the 3 month history. Thanks again[,] rich girl[.] Terri[.]"

[¶45.] Needless to say, the emails continued. In several instances, A.M. received more than one email per day.[10] In one fashion or another, the emails directed A.M. to approach Klaudt about performing the exams, and time was constantly a pressure. Many emails echoed conversations Klaudt had with A.M., including a reference to a car that A.M. could buy with her proceeds. One email even suggested that Linee could send a relaxant, or use alcohol to help A.M get through the exams, while another email indicated that Linee had a client "in dire need of a donor."

[¶46.] For the jury to find beyond a reasonable doubt that Klaudt used force or coercion, the evidence had to establish that Klaudt:

---

10. As indicated in footnote 8, *supra*, the emails detailed in the preceding paragraphs amount to a fraction of all the emails A.M. received.

(1) induced [A.M.] to do or perform some act under circumstances which[, actually or impliedly,] deprive[d] her of the exercise of her free will; or

(2) ma[d]e [A.M.] follow a prescribed or dictated course; or

(3) force[d] [A.M.] to act in a given manner by pressure, threats or intimidation; or

(4) compel[led] [A.M.] through pressure or necessity or . . . inflict[ed] or impose[d] [Klaudt's] will on [A.M.].

All of the factors in this case – A.M.'s history, age, vulnerability, and trust and respect for Klaudt; the manipulation; Klaudt's authoritative position as a foster parent and state legislator; the monetary incentives; and the emails – established there was sufficient evidence to prove beyond a reasonable doubt that A.M.'s consent was a product of psychological coercion. Therefore, A.M.'s consent to perform the exams was not effective.

[¶47.] Klaudt contends that because the jury instruction required coercion to be effected through unlawful conduct, Klaudt must be acquitted because he used deception as a means to obtain A.M.'s consent, and deception in this manner is not criminal under South Dakota law. His argument is flawed as this was not a mere case of deception. Clearly, deception was a factor in the underlying conduct, but it was not the only tactic Klaudt used to obtain A.M.'s consent.[11] As explained, the evidence of psychological coercion was substantial.

---

11. The substantial evidence of psychological coercion differentiates this case from cases decided in jurisdictions where, like South Dakota, use of deception to obtain consent to sexual penetration is not criminal, but where there is either no evidence of force or coercion, or the force or coercion is incomparable to what existed in this case. *See*, *e.g.*, Suliveres v. Commonwealth, 865 NE2d 1086 (Mass 2007) (defendant tricked twin brother's girlfriend into having sex

(continued . . .)

#24803

[¶48.]    Therefore, the trial court did not err in denying Klaudt's motion for acquittal on counts I, II, and III.

[¶49.]    Affirmed.

[¶50.]    GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

_____

(. . . continued)

with him); Commonwealth v. Culbreath, 1995 WL 1055824 (VaCirCt April 4, 1995) (defendant impersonated another in order to obtain consent to sexual penetration); People v. Hough, 159 Misc2d 997 (NYDistCt 1994) (defendant tricked twin brother's girlfriend into having sex with him); Commonwealth v. Goldenberg, 155 NE2d 187 (Mass 1959), *cert. denied*, Goldenberg v. Massachusetts, 359 US 1001, 79 SCt 1143, 3 LE2d 1032 (1959) (insufficient evidence of force to prove that intercourse was without the consent of the woman); Commonwealth v. Duchnicz, 42 PaCC 651 (1914), *rev'd on other grounds*, 59 PaSuperCt 527 (1915) (defendant procured consent to penetration by fraudulently impersonating woman's husband); Lewis v. State, 30 Ala 54 (1857) (defendant procured consent to penetration by fraudulently impersonating woman's husband).